# IN THE SUPREME COURT OF TENNESSEE
## AT JACKSON
### November 15, 2000 Session

## ERSKINE LEROY JOHNSON  v.  STATE OF TENNESSEE

**Appeal by Permission from the Court of Criminal Appeals**
**Criminal Court for Shelby County**
**No. P-9404     Hon. William H. Williams, Sr. Judge**

---

**No. W1997-00024-SC-R11-PD - Filed January 19, 2001**

---

The sole issue in this capital post-conviction appeal is whether the State improperly withheld material, exculpatory evidence at the appellee's capital sentencing hearing. The appellee was convicted of felony murder and sentenced to death in 1985, and in 1991, he filed a post-conviction petition alleging, among other things, that the State improperly withheld a police report that was discoverable under Brady v. Maryland, 373 U.S. 83 (1963). The post-conviction court denied relief, but the Court of Criminal Appeals reversed and vacated the capital sentence. Finding that the police report was exculpatory and material, the intermediate court held that a new sentencing hearing was constitutionally required. The State then appealed to this Court. For the reasons given herein, we hold that the State improperly withheld the police report, which was both "evidence favorable to the accused" and material as to the issue of sentencing. Accordingly, we affirm the judgment of the Court of Criminal Appeals vacating the appellee's sentence, and we remand this case to the Shelby County Criminal Court for a new capital sentencing hearing.

**Tenn. R. App. P. 11 Application for Permission to Appeal; Judgment of the Court of Criminal Appeals Affirmed; Case Remanded for Re-Sentencing**

WILLIAM M. BARKER, J., delivered the opinion of the court, in which E. RILEY ANDERSON, C.J., and FRANK F. DROWOTA, III, ADOLPHO A. BIRCH, JR., and JANICE M. HOLDER, JJ., joined.

Paul G. Summers, Attorney General and Reporter; Michael E. Moore, Solicitor General; Amy L. Tarkington, Senior Counsel Criminal Division, Nashville, Tennessee, for the appellant, State of Tennessee.

Joseph S. Ozment, Memphis, Tennessee; Jonathan I. Blackman, New York, New York; David E. Brodsky, New York, New York, for the appellee, Erskine Leroy Johnson.

## OPINION

This case comes before this Court on an appeal from a post-conviction petition filed by the appellee, Erskine Leroy Johnson, who was convicted of felony murder and sentenced to death by a jury in Shelby County in 1985. The events giving rise to this case occurred in early October of 1983 when the appellee and two other persons robbed a Food Rite Grocery Store in Memphis. Upon entering the store, the appellee approached the manager, who was working at the checkout counter, and the other two persons headed for the office where the safe was located. The appellee placed his pistol to the manager's head, and the manager turned around and threw up his hands. Witnesses testified that the manager hit or bumped into the appellee's pistol, causing it to fire a bullet into the ceiling of the store. After this shot was fired, the appellee shot the store manager twice, mortally wounding him. The appellee then went to the next open register, where he put his pistol close to the face of the manager's wife and demanded money. Meanwhile, the other two co-felons apprehended the security guard on the other side of the store, and one of them placed a pistol to his head. At some point during this episode, someone fired a bullet, known as the "Pac-Man" bullet, which went through a Pac-Man video-game machine and grazed a sixteen-year-old girl across her chest.

The appellee was tried and convicted of felony murder in December of 1985, and a jury sentenced him to die by electrocution. The jury found that the following three aggravating circumstances outweighed any mitigating circumstances: (1) that the defendant was previously convicted of one or more felonies that involved the use or threat of violence to the person, Tenn. Code Ann. § 39-2-203(i)(2) (1982); (2) that the defendant knowingly created a great risk of death to two or more persons, other than the victim murdered, during his act of murder, Tenn. Code Ann. § 39-2-203(i)(3) (1982); and (3) that the murder was committed while the defendant was engaged in the commission of a robbery, Tenn. Code Ann. § 39-2-203(i)(7) (1982). The appellee's conviction and sentence were later affirmed by this Court in State v. Johnson, 762 S.W.2d 110 (Tenn. 1988).

On October 3, 1991, the appellee filed a *pro se* petition for post-conviction relief, and his appointed counsel later filed an amended petition in December of 1991. Eventually, additional attorneys were appointed to represent the appellee, and these attorneys filed a second amended petition in August of 1996.[1] The trial court held a hearing lasting seven days between December 1996 and February 1997. During this hearing, the appellee introduced, among other things, proof showing that the State improperly withheld a police report at the sentencing hearing in violation of Brady v. Maryland, 373 U.S. 82 (1963). This police report, which was completed within days of the armed robbery, concluded that the "Pac-Man" bullet could not have been fired from the cash register area where the appellant was standing, due to the angle of the bullet entry into the machine. Moreover, photographs attached to the report showed that solid obstructions were between the cash register area and the Pac-Man machine. The appellee then argued that because he did not fire the

---

[1] The reason for the lengthy delay between the time of the original petition and the hearing in the trial court was that the petition lay dormant on the trial court's calendar while the appellee served a sentence in California for various offenses. Once the appellee completed serving the California sentence, he was transferred to this state and proceedings on the post-conviction petition were resumed.

bullet that grazed the sixteen-year-old girl, the proof was insufficient to establish the (i)(3) "great risk of death" aggravating circumstance.[2] On April 22, 1997, the trial judge dismissed the appellee's petition, finding that "the petition for post conviction relief as amended is without merit." Although the trial court found the felony murder aggravating circumstance inapplicable after this Court's decision in State v. Middlebrooks, 840 S.W.2d 317 (Tenn. 1992), the court found that the error was harmless given "the strong case supporting the other two aggravating circumstances found by the jury . . . ." The trial court made no specific written findings with respect to the alleged Brady violation concerning the withheld police report.

The Court of Criminal Appeals reversed the dismissal of the petition and remanded the case for a new capital sentencing hearing. The intermediate court found that the withheld police report was material exculpatory evidence within the meaning of Brady v. Maryland, 373 U.S. 83 (1963), and therefore, the report should have been disclosed to the appellee. This failure to disclose the police report, the court stated, resulted in an arguable misapplication of the (i)(3) aggravating circumstance. Viewing the withheld report in combination with the unconstitutional application of the felony murder aggravating circumstance, the court stated that it was "unable to conclude that the jury would have sentenced the Defendant to death based solely on the prior violent felonies aggravator." Accordingly, while the Court of Criminal Appeals affirmed the judgment of the trial court in all other respects, it remanded the case for a new capital sentencing hearing.

The State then requested, and this Court granted, permission to appeal on the sole issue of whether the withheld police report was "material" as applied to the (i)(3) "great risk of death" aggravating circumstance. After reviewing the extensive record in this case, we conclude that the police report was both "evidence favorable to the accused" and "material" within the meaning of Brady v. Maryland. We therefore hold that the report should have been disclosed to the appellee prior to his sentencing hearing, and because the State's failure to disclose this police report severely undermines our confidence in the jury's sentence of death, we remand this case to the Shelby County Criminal Court for a new capital sentencing hearing.

## ALLEGED *BRADY* VIOLATION DURING THE APPELLEE'S CAPITAL SENTENCING HEARING

Every criminal defendant is guaranteed the right to a fair trial under the Due Process Clause of the Fourteenth Amendment to the United States Constitution and the "Law of the Land" Clause of Article I, section 8 of the Tennessee Constitution. See, e.g., State ex rel. Anglin v. Mitchell, 596 S.W.2d 779, 786 (Tenn. 1980). "To facilitate this right, a defendant has a constitutionally protected privilege to request and obtain from the prosecution evidence that is either material to guilt or relevant to punishment." State v. Ferguson, 2 S.W.3d 912, 915 (Tenn. 1999). This fundamental

---

[2] At the time of the appellee's offense, the (i)(3) aggravating circumstance read as follows: "The defendant knowingly created a great risk of death to two (2) or more persons, other than the victim murdered, during his act of murder." Tenn. Code Ann. § 39-2-203(i)(3) (1982 & Supp. 1986).

principle of law is derived from the landmark case, Brady v. Maryland, 373 U.S. 83 (1963), in which the United States Supreme Court held that "suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution," id. at 87.[3]  Evidence "favorable to an accused" includes evidence deemed to be exculpatory in nature and evidence that could be used to impeach the state's witnesses.  See State v. Walker, 910 S.W.2d 381, 389 (Tenn. 1995); State v. Copeland, 983 S.W.2d 703, 706 (Tenn. Crim. App. 1998); see also United States v. Bagley, 473 U.S. 667, 676 (1985).

While the "prosecution is not required to disclose information that the accused already possesses or is able to obtain," State v. Marshall, 845 S.W.2d 228, 233 (Tenn. Crim. App. 1992), the "prosecution's duty to disclose is not limited in scope to 'competent evidence' or 'admissible evidence,'" id. at 232; see also State v. Brooks, 386 So. 2d 1348, 1351 (La. 1980) ("The Brady rules of disclosure apply not just to information favorable to the accused which the state itself believes to be credible, but to any material information that is favorable to the accused.").  As the United States Supreme Court has recognized, "the prosecutor is responsible for 'any favorable evidence known to the others acting on the government's behalf in the case, including the police.'"  Strickler v. Greene, 527 U.S. 263, 275 n.12 (1999) (citing Kyles v. Whitley, 514 U.S. 419, 437 (1995)).  Despite this obligation, however, there is "'no constitutional requirement that the prosecution make a complete and detailed accounting to the defense of all police investigatory work on a case.'"  Walker, 910 S.W.2d at 389 (quoting Moore v. Illinois, 408 U.S. 786, 795 (1972)).

This Court has held on several occasions that in order to establish a Brady violation, four elements must be shown by the defendant:

1)  that the defendant requested the information (unless the evidence is obviously exculpatory, in which case the State is bound to release the information whether requested or not);
2)  that the State suppressed the information;
3)  that the information was favorable to the accused; and
4)  that the information was material.

See State v. Edgin, 902 S.W.2d 387, 390 (Tenn. 1995); see also Walker, 910 S.W.2d at 389.  In this case, there is no question that the first two requirements have been met.  Before the appellee's trial in 1985, defense counsel made a general Brady request seeking "copies of and the right to inspect any written statements given to the prosecution and/or any investigatory agencies which in whole or in part support the innocence of the accused and/or is exculpatory in nature . . . ."  Moreover, it

---

[3] This disclosure obligation applies specifically to materials in mitigation of sentence.  See Brady, 373 U.S. at 87-88 ("A prosecution that withholds evidence on demand of an accused which, if made available, would tend to exculpate him or *reduce the penalty* helps shape a trial that bears heavily on the defendant.") (emphasis added).

is clear that the State has suppressed this police report given that it has had this report in its possession since its completion on October 8, 1983.[4]

We also conclude that the police report is information favorable to the accused. Information that is favorable to the accused may consist of evidence that "could exonerate the accused, corroborate[] the accused's position in asserting his innocence, or possess[] favorable information that would have enabled defense counsel to conduct further and possibly fruitful investigation regarding the fact that someone other than the appellant killed the victim." Marshall, 845 S.W.2d at 233. As the Massachusetts Supreme Court has articulated the standard, "[t]he Brady obligation comprehends evidence which provides some significant aid to the defendant's case, whether it furnishes corroboration of the defendant's story, calls into question a material, although not indispensable, element of the prosecution's version of the events, or challenges the credibility of a key prosecution witness." Commonwealth v. Ellison, 379 N.E.2d 560, 571 (Mass. 1978); see also Mazzan v. Warden, Ely State Prison, 993 P.2d 25, 37 (Nev. 2000) (stating that evidence is favorable under Brady if "it provides grounds for the defense to attack the reliability, thoroughness, and good faith of the police investigation, to impeach the credibility of the state's witnesses, or to bolster the defense case against prosecutorial attacks"). As we view the police report in the context of the State's theory supporting the death penalty at the sentencing hearing, we conclude that this third factor is easily met.

The State's principal theory as to the application of the (i)(3) aggravating circumstance was that the appellee fired the "Pac-Man" bullet that grazed a sixteen-year-old girl, Melinda Jordan,[5] and the State made clear that it believed that the appellee alone fired the shots from the cash register area during the robbery. During the guilt phase of the trial, the State's attorney questioned Ms. Jordan about her wound, to which defense counsel objected on the ground that her testimony was irrelevant to the issue of the appellee's guilt for the murder. In response, the State argued that the evidence was relevant to establish the *res gestae* of the offense, and when asked by the Court as to whether anyone other than the appellee could have fired the bullets, counsel for the State responded:

Well, I think you have to be pretty speculative to think that though. . . . Let me submit to Your Honor what I thought that I had shown. All of the shots that everybody, all the witnesses who have testified from the store were asked if all the shots came from the same area. . . . And [Ms. Jordan] said that [the shots had come from the same area]. So I certainly think that we have shown that all—if all of the

---

[4] As we stated previously, "the prosecutor is responsible for 'any favorable evidence known to the others acting on the government's behalf in the case, including the police.'" Strickler, 527 U.S. at 275 n.12 (citing Kyles, 514 U.S. at 437). As such, even if the State was not actually aware of the police report within its possession, it is charged with knowledge of the report for purposes of Brady. See id.

[5] This witness was referred to as Melinda Scott and Melinda Jordan, she having been married between the time of the murder and the time of the trial. For sake of consistency, we refer to this witness as Ms. Jordan.

shots came from the same area and if there was only one gunman in that area, then that gun fired the shots.

As demonstrated by the State's answer, it believed that the appellee, as the only person firing shots from the cash register area, was solely responsible for firing the "Pac-Man" bullet that grazed Ms. Jordan.[6] The State then later argued during the sentencing phase that because the appellee alone placed Ms. Jordan's life in danger, the "great-risk-of-death" aggravator applied to warrant the death sentence.

However, as the withheld police report demonstrates, not all of the shots fired during the offense came from the cash register area. In fact, with respect to the "Pac-Man" bullet itself, the withheld report concludes that

> it was determined that the bullet struck and penetrated the cabinet side [of the "Pac-Man" machine] at an angle of 15.5° from the front, this angle[,] projected in an imaginary line westward[,] would *extend to the front door of the store* and the bullet was fired from some point along this line.

(emphasis added). It is undisputed that the cash register area where the defendant was standing was not along this "imaginary line" extending from the "Pac-Man" machine to the front doors of the store, and the State introduced no proof whatsoever that the appellee fired any shots from near the front door of the store. As such, the report directly contradicts the principal portion of the State's theory concerning the application of the (i)(3) aggravating circumstance: that the appellee fired the "Pac-Man" bullet that grazed Ms. Jordan, putting her in great risk of death.

When viewed in light of the State's theory, the withheld police report clearly tends to "corroborate the accused's position in asserting his innocence [in firing the "Pac-Man" bullet]." Cf. Marshall, 845 S.W.2d at 233. Moreover, because the report calls into question a key "element of the prosecution's version of events," *i.e.*, that the appellee fired the "Pac-Man" bullet, cf. Ellison, 379 N.E.2d at 571, this report constitutes "evidence favorable to the accused" within the meaning of Brady, and it should have been disclosed by the State. Accordingly, we conclude that the appellee has successfully established the third element needed to assert a constitutional violation under Brady.

The only remaining issue, then, is whether the failure of the State to disclose the police report was "material" as to the sentence of death. Evidence is deemed to be material when "there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different." State v. Edgin, 902 S.W.2d 387, 390 (Tenn. 1995); see also State v. Walker, 910 S.W.2d 381, 389 (Tenn. 1995); State v. Copeland, 983 S.W.2d 703, 706 (Tenn. Crim. App. 1998). Despite the language of probabilities used in our cases, however, it must be

---

[6] Indeed, all of the State's witnesses, including Ms. Jordan, confirmed that they thought that all of the shots fired that morning came from the cash register area of the store where the appellee was standing.

emphasized that the test of materiality is not whether the defendant would more likely than not have received a different verdict had the evidence been disclosed. See Strickler v. Greene, 527 U.S. 263, 275 (1999).[7] Nor is the test of materiality equivalent to that of evidentiary sufficiency, such that we may affirm a conviction or sentence when, "after discounting the inculpatory evidence in light of the undisclosed evidence, the remaining evidence is sufficient to support the jury's conclusions." Id.; Kyles v. Whitley, 514 U.S. 419, 435 n.8 (1995) ("This rule is clear, and none of the Brady cases has ever suggested that sufficiency of evidence (or insufficiency) is the touchstone [of materiality]."). Instead, a reviewing court must determine whether the defendant has shown that "the favorable evidence could reasonably be taken to put the whole case in such a different light as to undermine the confidence of the verdict." Irick v. State, 973 S.W.2d 643, 657 (Tenn. Crim. App. 1998) (citing Edgin, 902 S.W.2d at 390); see also Strickler, 527 U.S. at 290. In other words, evidence is material when, because of its absence, the defendant failed to receive a fair trial, "understood as a trial resulting in a verdict worthy of confidence." Kyles, 514 U.S. at 434.

After carefully reviewing the extensive record in this appeal, including the record of the original trial, we believe that the withheld police report "could reasonably be taken to put the whole case in such a different light as to undermine confidence in the [sentencing] verdict." As in Kyles, 514 U.S. at 445, the "likely damage" from the State's suppression of the police report in this case "is best understood by taking the word of the prosecutor" during his arguments to the jury. As the State concedes in its brief before this Court, "the prosecutor did rely heavily upon the Pac-Man bullet in closing argument to establish the great risk aggravator," and the emphasis placed upon this critical factor by the State can first be seen from its opening statement to the jury at the sentencing phase:

> And I think that all three of these statutory aggravating circumstance, there's no question that they've been proven, *especially the one where two or more people.* I think that the testimony was different as to the number of people that were in the store at the time Mr. Belenchia was killed. *We do know that one of the other witnesses was wounded herself.* Her name is Melinda Jordan, scraped across the chest by one of the bullets. . . . I mean, this is a frightening thing that happened out there. Melinda Jordan who's sixteen years old then, now she's eighteen. She's married. *How close did she come to dying? Maybe two inches, an inch?*

---

[7] In particular, Justice Souter's concurring opinion in Strickler underscores the misleading nature of the term "probability" in Brady jurisprudence:

> [T]he continued use of the term "probability" raises an unjustifiable risk of misleading courts into treating it as akin to the more demanding standard, "more likely than not." While any short phrases for what the cases are getting at will be "inevitably imprecise," I think "significant possibility" would do better at capturing the degree to which the undisclosed evidence would place the actual result in question, sufficient to warrant overturning a conviction or sentence.

527 U.S. at 298 (Souter, J., concurring). Even substituting the phrase "reasonable probability" with "significant possibility," though, Justice Souter emphasized that "the touchstone of the enquiry must remain whether the evidentiary suppression 'undermines our confidence' that the factfinder would have reached the same result." Id. at 300-01.

(emphasis added). Later in rebuttal argument during closing, the district attorney read all of the aggravating circumstances and the evidence supporting them. With regard to the (i)(3) aggravating circumstance, the full statement of the district attorney is as follows:

Number Three,

"The defendant knowingly created a great risk of death to two or more persons other than the victim murdered during his act of murder."

Melinda Scott was shot. Melinda Scott came very near death, well, not death. She was shot. If the bullet had gone to a different area of the body close by, it could've caused death. She was shot. We all know the consequences of being shot, the potential consequences of that.

From these statements, it is clear that the State relied heavily—if not almost exclusively—upon the shooting of this one sixteen-year-old girl to justify finding the (i)(3) aggravating circumstance, and also to support the finding that this aggravating circumstance, when considered with the others, outweighed any mitigating circumstances. Indeed, in its rebuttal argument, the State summarized its proof before the jury *solely* in terms of the harm suffered by Ms. Jordan, thereby ignoring any great risk of death faced by others in the store. As is seen from its arguments at trial, the attention of the State, and likely that of the jury as well, was focused almost exclusively upon the harm suffered by this one girl.

We conclude that the disproportionate amount of attention devoted to showing that the appellee fired the infamous "Pac-Man" bullet, combined with the fact that the withheld police report seems to indicate that the appellee was never in a position to fire this bullet, certainly undermines confidence in the jury's sentence of death, as it significantly weakens confidence in the jury's finding and weighing of this particular aggravating circumstance. While the State is correct that the withheld report "does not remove the possibility that Johnson fired the PacMan bullet," the withheld report substantially undermines that conclusion, especially in the absence of any proof that the appellee fired any bullets along the relevant line of fire. Under these circumstances, we cannot be reasonably confident that every single member of the jury, after considering the withheld report, would have applied this aggravating circumstance or that every member of the jury would have assigned it the same weight in relation to the other aggravating and mitigating circumstances. Accordingly, we hold that the withheld police report is "material" within the meaning of Brady.

In response, the State argues that the withheld police report is not material because "it is clear that any reasonable juror would have applied the [(i)(3)] aggravator to Johnson's own actions even if the PacMan Bullet had never been fired." More specifically, the State contends (1) that the other shots fired by the appellee were sufficient by themselves to establish the (i)(3) aggravating circumstance; and (2) that because the (i)(3) aggravating circumstance may be applied vicariously, the jury would have found and considered this aggravating circumstance even if the appellee did not

-8-

fire the "Pac-Man" bullet. We disagree that either of these arguments renders the withheld police report immaterial for purposes of Brady.

Upon examination of the substance of these arguments, it is clear that the State is attempting to make a sufficiency of the proof argument, *i.e.*, that because the proof is sufficient for a jury to find this aggravating circumstance on other grounds without the police report, the police report is not material to the appellee's case. The State misconstrues the nature of a Brady materiality inquiry, because, as we stated earlier, the measure of materiality is not that of evidentiary sufficiency. See Strickler, 527 U.S. at 275. Rather, materiality is established "by showing that the favorable evidence could reasonably be taken to put the whole case in such a different light as to undermine confidence in the verdict," Kyles, 514 U.S. at 435, and the appellee has made this showing to our satisfaction. Nevertheless, because the proper application of the (i)(3) aggravating circumstance is an issue infrequently discussed in our opinions, we take the opportunity to discuss the State's arguments on their merits.[8]

The State first argues that the other shots fired by the appellee were sufficient by themselves to establish the (i)(3) aggravating circumstance. This Court has previously held that this aggravating circumstance "contemplates either multiple murders or threats to several persons at or shortly prior to or shortly after an act of murder upon which the prosecution is based." State v. Cone, 665 S.W.2d 87, 95 (Tenn. 1984).[9] Most commonly, this aggravating circumstance "has been applied where a defendant fires multiple gunshots in the course of a robbery or other incident at which persons other than the victim are present." State v. Henderson, 24 S.W.3d 307, 314 (Tenn. 2000) (citing State v. Burns, 979 S.W.2d 276, 280 (Tenn. 1998)). In many of the cases upholding application of the (i)(3) aggravator, the defendant fired random shots with others present or nearby,[10] the defendant engaged

---

[8] The appellee vigorously objects to the State changing its theory of the case on appeal with respect to the (i)(3) aggravating circumstance. While the general rule is that a party "may not litigate an issue on one ground, abandon that ground post-trial, and assert a new basis or ground for his contention in this Court," State v. Matthews, 805 S.W.2d 776, 781 (Tenn. Crim. App. 1990), this rule is subject to some flexibility. As the California Supreme Court once articulated these exceptions,

> If a question of law only is presented on the facts appearing in the record the change in theory may be permitted. But if the new theory contemplates a factual situation the consequences of which are open to controversy and were not put in issue or presented at the trial the opposing party should not be required to defend against it on appeal.

Panopulos v. Maderis, 303 P.2d 738, 740-41 (Cal. 1956). In this case, the State argues that other evidence introduced at the trial may be used to establish the (i)(3) aggravating circumstance. To the extent that the State argues new legal theories based on the facts already contained in the record, we are permitted, though certainly not required, to consider them in this case.

[9] The (i)(3) aggravating circumstance has not been changed since 1982, except for a slight modification by the 1989 Criminal Code Revision. See Tenn. Code Ann. § 39-13-204(i)(3) (1997 & Supp. 2000).

[10] See, e.g., Henderson, 24 S.W.3d at 314 (defendant fired random shots through "paper-thin" walls of a dentist's office where others were present); Burns, 979 S.W.2d at 281 (Tenn. 1998) (defendants fired pistol at three

(continued...)

-9-

in a shoot-out with other parties,[11] or the defendant actually shot people in addition to the murder victim.[12] In at least one case, this Court has affirmed application of the (i)(3) aggravating circumstance when the defendants fired two shots, one into the ceiling and a second into the victim, when the defendants also held others at gun point and the surrounding circumstances of the offense indicated that "the threat to their lives was very real." King v. State, 992 S.W.2d 946, 950-51 (Tenn. 1999).

We disagree with the State's assertion that the (i)(3) aggravating circumstance was present beyond a reasonable doubt in this case based on the appellee's actions without considering the "Pac-Man" bullet. The appellee fired three known shots: two into the store manager and one into the ceiling. The shots fired at the store manager were fired at point-blank range, and no other person was within the immediate vicinity or within the line of fire.[13] Moreover, the stray bullet fired into the ceiling was not an intentional shot fired by the appellee to intimidate the other customers, as was the case in State v. King, nor was the bullet fired by the appellee as part of a random shooting spree, as in State v. Henderson, State v. Burns, or State v. McKay.[14] We see no indication that the appellee threatened the lives of the other customers as did the defendants in King, nor did he actually shoot any other person, as was the case in State v. Johnson, McKay, or State v. Workman.

From our review of the original trial transcript, we did find testimony that the appellee, after shooting the manager, held his pistol to the head of the store manager's wife and demanded money. While this fact could help provide a basis for finding the (i)(3) aggravating circumstance, we note that the great-risk-of-death aggravator requires that *two or more* people, other than the victim

_____

[10] (...continued)
people in a car and then, while escaping, fired random shots at bystanders playing basketball); State v. McKay, 680 S.W.2d 447 (Tenn. 1984) (defendant fired random shots in a store with other people near by).

[11] See, e.g., State v. Workman, 667 S.W.2d 44 (Tenn. 1984) (defendant engaged in shoot-out with police, killing one officer, wounding a second, and missing a third);

[12] See, e.g., State v. McKay, 680 S.W.2d 447 (Tenn. 1984) (defendants shot and killed a second person and wounded a third with a shot to the back); State v. Johnson, 632 S.W.2d 542 (Tenn. 1982) (defendant shot three people inside of store, immediately prior to shooting and killing two other people in the parking lot as the defendant fled).

[13] From our examination of the trial transcript, it appears that the closest person to the appellee at the time of the manager's shooting was about fifteen feet away, and it is undisputed that this person was not in the direct line of fire.

[14] From all accounts contained in the record of the original trial, including the State's closing argument at the guilt phase of trial, the bullet that was fired accidentally into the ceiling was fired when the store manager hit the appellee's pistol as he turned around. As the district attorney stated in closing arguments during the guilt phase,
> What did the evidence show then? I think the evidence showed that Mr. Belenchia kind of went up. I think Mr. Perkins said he might've hit his hand. Well, where do we know for sure that one bullet went? It went into the ceiling. And I submit to you that that's consistent with the fact that Mr. Belenchia came up and probably hit his gun and that's when the bullet was fired up in the ceiling.

murdered, be placed in great risk of death.[15]  See Tenn. Code Ann. § 39-2-203(i)(3).  From our examination of the record, we cannot conclude that the State proved beyond a reasonable doubt that another person was placed in great risk of death by the appellee without the "Pac-Man" bullet, and we decline to adopt a *per se* rule that would automatically allow this aggravating circumstance in all felony murder cases where the defendant is armed with a pistol and others are present.  Such a *per se* rule would not adequately provide for individualized sentencing, and it would unnecessarily broaden the (i)(3) aggravating circumstance to a point that it would fail in its essential function of narrowing the death-eligible class.  Cf. State v. Keen, 31 S.W.3d __, __ (Tenn. 2000) ("The very purpose of the consideration of aggravating circumstances within a scheme of capital punishment is to provide some principled guidance for the sentencing authority to choose between death and a lesser sentence.")

Even if the evidence did support a finding of this aggravating circumstance beyond a reasonable doubt without the "Pac-Man" bullet, however, such a finding would not render the withheld police report immaterial.  Significantly, the State never argued that the (i)(3) aggravating circumstance applied because the appellee held his pistol to the head of the store manager's wife. Moreover, the State only briefly alluded to the fact at the sentencing hearing that others were present in the store, and the State *never* mentioned these other persons during its summary of the proof supporting the (i)(3) aggravator in rebuttal argument.  Contrary to the State's assertions before this Court that the "Pac-Man" bullet was merely "gravy," or additional proof not needed to establish this aggravator, the actions of the State at trial reveal that virtually its entire case for application of the (i)(3) aggravator was built on the fact that a sixteen-year-old girl was grazed by a random bullet.  As such, it seems likely, even probable, that the jury gave considerable weight to the State's argument that the appellee fired the shot that grazed Ms. Jordan.  Under these circumstances, we conclude that the withheld report is still material, even if other evidence supported application of the (i)(3) aggravating circumstance, because the fact of its suppression significantly undermines our confidence in the jury's sentence of death.[16]

The State also urges this Court to adopt the view that the (i)(3) aggravating circumstance may be applied vicariously, such that the jury could have found and considered this aggravating circumstance even if someone other than the appellee fired the "Pac-Man" bullet.  Although no court in this state has ever held that the (i)(3) aggravating circumstance may be applied vicariously, the Court of Criminal Appeals has recently held that some statutory aggravating circumstances may be applied vicariously, consistent with the federal and state constitutions, where the statutory language

---

[15]  Indeed, the testimony from the other persons present demonstrated that as soon as the first bullet was fired into the ceiling, the customers all ran to the back of the store.  This is much different than the circumstances of King, wherein the defendants forced everyone to lie down at gun point with threats of death if they "even raised their heads an inch."

[16]  Our conclusion that the police report is material, in part, because there is little or no proof in this record other than the "Pac-Man" bullet to support application of the (i)(3) aggravating circumstance does not preclude the State from relying upon and attempting to establish the aggravator at a new sentencing hearing.  See State v. Harris, 919 S.W.2d 323 (Tenn. 1996).

permits vicarious application. See Owens v. State, 13 S.W.3d 742, 760 (Tenn. Crim. App. 1999).

At issue before the Owens Court was the vicarious application of the (i)(5) aggravating circumstance—that the murder is "especially heinous, atrocious, or cruel." In conducting its analysis of the statutory language of this aggravator, the court first noted that "[c]ertain aggravators focus clearly on the defendant's *own actions or intent* and contemplate consideration of the defendant's *individual* actions in determining the most culpable capital defendants. Alternatively, other statutory aggravators, by their plain language, clearly encompass consideration of the *nature and circumstances of the crime itself*, permitting vicarious application." Id. at 763 n.13 (citations omitted) (emphasis in original). Concluding that the (i)(5) aggravating circumstance was one that fell within the latter category, the court stated,

> After examination of this issue, we conclude that it was the legislature's intent that the (i)(5) aggravator impute liability upon a defendant for conduct for which he or she is criminally responsible. This aggravator, by its plain language, clearly encompasses consideration of the *nature and circumstances of the crime itself*, which would permit such a vicarious application. The emphasis in the (i)(5) aggravator is on the *manner of killing*, not on the defendant's actual participation.

Owens, 13 S.W.3d at 763 (citations omitted) (emphasis in original).

Following the analysis set forward in Owens, and examining the statutory language of the (i)(3) aggravating circumstance, we must decline the State's invitation to allow vicarious application of this aggravator. At the time of the appellee's offense, the (i)(3) aggravating circumstance read as follows: "The defendant knowingly created a great risk of death to two (2) or more persons, other than the victim murdered, during his act of murder." Tenn. Code Ann. § 39-2-203(i)(3) (1982 & Supp. 1986). Unlike other aggravating circumstances, such as the (i)(5) aggravator, the statutory language of the (i)(3) aggravating circumstance simply does not permit application of this aggravating circumstance unless the defendant "knowingly created" the "great risk of death," either by his or her own actions or by directing, aiding, or soliciting another to do the act, *i.e.*, to shoot the gun, that creates the great risk of death. Without some proof that the defendant in some way "knowingly created" the "great risk of death," this aggravating circumstance does not apply, even though a great risk of death may have been created by someone during the course of the criminal episode. Because this aggravating circumstance focuses more upon the defendant's actions and intent rather than upon the actual circumstances surrounding the killing, we decline to accept the State's invitation to vicariously apply the (i)(3) aggravating circumstance,[17] and we continue to hold that the withheld police report is still material to the issue of the appellee's capital sentence.

---

[17] That the (i)(3) aggravating circumstance is one that focuses on the defendant's own actions and intent is the same conclusion reached, albeit in dicta, by the Owens Court. See 13 S.W.3d at 763 n.13. While we formally adopt the method used by the Owens Court in analyzing this issue, we do not necessarily adopt the conclusions of that court in applying this analysis to any aggravating circumstance other than the (i)(3) aggravator.

Having found that all four elements necessary to establish a <u>Brady</u> violation are present, including that the withheld police report reasonably undermines confidence in the jury's verdict, we must remand this case for a new capital sentencing hearing. The intermediate court in this case conducted further harmless error analysis to determine the effect that the <u>Brady</u> error had upon the sentencing hearing. However, as the United States Supreme Court stated in <u>Kyles v. Whitney</u>,

> once a reviewing court applying <u>Bagley</u> has found constitutional error there is no need for further harmless-error review. Assuming, arguendo, that a harmless-error enquiry were to apply, a <u>Bagley</u> error could not be treated as harmless, since "a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different," necessarily entails the conclusion that the suppression must have had "substantial and injurious effect or influence in determining the jury's verdict."

514 U.S. at 435 (internal citations omitted). Nevertheless, we agree with the conclusion of the Court of Criminal Appeals that a <u>Brady</u> violation was established and that the violation was compounded by the jury's consideration of the felony murder aggravating circumstance in violation of this Court's decision in <u>State v. Middlebrooks</u>, 840 S.W.2d 317 (Tenn. 1992). The appellee's sentence, therefore, is vacated, and this case is remanded to the Shelby County Criminal Court for a new capital sentencing hearing.

## CONCLUSION

In summary, we hold that the police report withheld by the State in the appellee's original trial is "favorable information" that is material to the issue of sentencing within the meaning of <u>Brady v. Maryland</u>, 373 U.S. 83 (1963), and its progeny. Because a finding of materiality obviates the need for further harmless error analysis, we affirm the judgment of the Court of Criminal Appeals and remand this case to the Shelby County Criminal Court for further proceedings consistent with this opinion.

Costs of this appeal shall be paid by the appellant, the State of Tennessee.

_____
WILLIAM M. BARKER, JUSTICE

-13-