IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT NASHVILLE
Assigned on Briefs November 27, 2012 at Knoxville

**STATE OF TENNESSEE v. GENE EARL STANLEY**

**Direct Appeal from the Criminal Court for Sumner County**
**No. 790-2010      Dee David Gay, Judge**

_____

**No. M2012-00664-CCA-R3-CD - Filed January 14, 2013**

_____

A Sumner County jury convicted the Defendant, Gene Earl Stanley, of one count of burglary, two counts of theft of property, felony evading arrest, reckless endangerment, driving under the influence of an intoxicant, and driving on a canceled, revoked, or suspended license. The trial court sentenced the Defendant as a Career Offender to an effective sentence of forty-eight years. Three months after the jury's verdict and one month after sentencing, the Defendant filed a motion for new trial, which the trial court ultimately denied. On appeal, the Defendant contends that he was denied due process when the State failed to provide him "potentially exculpatory evidence" that was in the State's possession. The State counters that the Defendant's motion for new trial was untimely filed. After a thorough review of the record and relevant law, we affirm the trial court's judgments.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Criminal Court Affirmed**

ROBERT W. WEDEMEYER, J., delivered the opinion of the Court, in which D. KELLY THOMAS, JR., and CAMILLE R. MCMULLEN, JJ., joined.

Joseph B. Freedle, Gallatin, Tennessee, for the appellant, Gene Earl Stanley.

Robert E. Cooper, Jr., Attorney General and Reporter; Clarence E. Lutz, Assistant Attorney General; L. Ray Whitley, District Attorney General; and Lytle A James, Assistant District Attorney General, for the appellee, the State of Tennessee.

**OPINION**

**I. Facts**

This case arises from the burglary of Vic Jenkins Automotive, during which items, including a Camaro Z28, were stolen and after which the driver of the Camaro Z28 engaged in a high speed chase from the police. In relation to this burglary, the Sumner County grand jury indicted the Defendant for three counts of theft of property, one count of burglary, one count of felony evading arrest, one count of felony reckless driving, one count of driving under the influence, one count of driving without a license, one count of driving on a revoked or suspended license, and one count of violating the implied consent statute. The State later dismissed one of the counts of theft.

At the Defendant's trial on these charges, the following evidence was presented:[1] Officer Greg Alvis, with the Gallatin Police Department, testified that, on August 29, 2010, at about 12:34 a.m., he noticed a red Camaro, driven by the Defendant, come out of the rear of Vic Jenkins Automotive, from near the shop area, at a high rate of speed. Officer Alvis was aware that a Camaro had been stolen from that business nine days before, and he decided to follow the Camaro. While following the Defendant, Officer Alvis only lost sight of him "momentarily" due to a change in the elevation of the roadway. Officer Alvis followed the Camaro until it "maneuvered" almost completely into the oncoming lane of travel, after which the officer initiated his emergency lights in order to pull over the Camaro. The Defendant turned on his right blinker and activated his brake lights. Before the Defendant pulled over to the shoulder of the roadway, he accelerated and entered the exit ramp heading North.

Officer Alvis activated his siren and followed the Defendant, contacting dispatch to inform them that the Camaro he had attempted to pull over had failed to stop. He gave the Camaro's description and tag number to dispatch. Officer Alvis followed the Defendant, who reached speeds in excess of 110 miles per hour, while passing other cars on the roadway. Sumner County officers, who were nearby, informed Officer Alvis that they had "stop sticks," which are small metal spikes used to puncture tires making them slowly deflate. The county officers placed the stop sticks in the road in front of the Defendant's car, and the Defendant ran over the spikes, which punctured one of his tires. The sticks also punctured Officer Alvis's tires, and he pulled over and yielded the pursuit to other officers.

Officer Chris Ford picked up the chase after Officer Alvis pulled over. He caught up to the Defendant and then another officer, Deputy Lester, pulled in front of him, and Officer Ford fell back to the second car chasing the Defendant. Even after one of his tires had been punctured by the stop sticks, the Defendant reached speeds over 100 miles a hour. Debris from the Defendant's punctured tire began flying up and hitting the police cars. There was

---

[1] Because the Defendant does not challenge the sufficiency of the evidence against him, we summarize the facts presented during the trial in the light most favorable to the State.

also smoke coming from the tire. The Defendant continued on toward Portland, and Portland police officers placed a second set of stop sticks in the roadway. The Defendant ran over these second stop sticks and the Camaro began "fish-tailing" through the lane. Eventually, the Defendant ran the Camaro off the roadway and onto a grass embankment.

As soon as the Camaro came to a stop, Officer Ford ran toward to the driver's side door of the Camaro. As the officer was approaching the Camaro, the Defendant exited the Camaro and attempted to flee. The seatbelt of the Camaro, however, was wrapped around the Defendant's leg, preventing his flight. The officers approached the car, yelling commands, and the Defendant failed to heed their commands and continued trying to run. The officers then deployed a taser weapon and took the Defendant into custody. Officer Ford and Officer Shaun Lester both testified that the Defendant was alone in the Camaro.

Officer Ford noticed the strong odor of alcohol emanating from the Defendant when he took the Defendant into custody. Officer Ford looked inside the car, and he noted there were "rims and tires" in both the back seat and the front passenger seat. He testified that, because the rims and tires were in the car, there was not room for a passenger.

The owner of the Camaro that was stolen, Paige Raynor, testified that her father gave her the car to restore in June of that year. The car, she said, had a value of between $8,900 and $9,500. She took the car to Vic Jenkins Chevrolet to have some paint work done on the hood. The car was stolen from the Vic Jenkins Chevrolet service shop lot while it was there for repair.

Officer Alvis investigated the Defendant's driving history and learned that the Defendant's driver's license was suspended at the time of his arrest. He further learned that the Defendant's driving privileges had been suspended on three previous occasions.

Darrell Barber, the Collision Repair Manager with Vic Jenkins Automotive, testified that, on the night of this incident, a "significant amount of damage [was] done to the [Vic Jenkins Automotive] building." It appeared that the gate had been broken into or climbed over in order for the burglar to gain access to the building. The burglar broke the rear window of the collision repair center, where he took tires and wheels from the shop valued in excess of $1,000. The burglar also took a Camaro, which was located inside the shop. Barber said the work to the Camaro was almost completed, pending his receipt of one part. He had parked the Camaro inside the collision repair center while he was awaiting that part. Barber recalled that a week before the Camaro was taken, the collision repair center had been burglarized and a company truck had been driven through the gate surrounding the building.

Detective Tim Anschuetz, with the Gallatin Police Department, interviewed the

Defendant after the Defendant's arrest. The Defendant told the officer that he had no recollection of the incident. He told the officer that all he recalled was being in the parking lot of Hank's Bar. He remembered that he drank two twenty-four ounce beers and a half-pint of vodka. He said he began talking with a man and a lady who had some whiskey, and he drank some of their whiskey and "hit a joint with them," which was the last thing he remembered. The Defendant said his next memory was awaking in the hospital. When the detective asked him about driving the Camaro, the Defendant said "if I'm driving something does that mean I stole it?"

Detective Anschuetz testified during cross-examination that he believed that an evidence technician dusted for fingerprints and obtained several latent prints from the Camaro. He said he thought those prints were never sent for further testing. He said there were also multiple shoe prints in the dust on the floor of the garage, and the evidence technician conducted two "electro-static" lifts of the shoe prints. The detective learned that, at the time of these crimes, the Defendant was living with the Defendant's brother and the Defendant's brother's wife, who lived on a street behind Vic Jenkins Cheverolet.

The Defendant testified that he had previously been convicted of felonies and that he pled guilty to each of those because he was guilty. He said he was not, however, guilty of the charges in this case. He said that, the week before this incident, he had been kicked out of his apartment for fighting with another man. He said that his truck was "bowed up," and he was at that point homeless. He asked his brother if he could live with him for a couple of weeks and, in exchange, the Defendant would work on his brother's house. His brother agreed and, as of August 29, 2010, he had lived with his brother for about a week.

The Defendant described how, on August 29, he worked on his brother's house for most of the day and then ate dinner with his brother. He said he drank "one beer" and then took a bath and talked to his "ex-old lady" for about thirty minutes on the phone while drinking another beer. The Defendant estimated that it was "close to 10:00" p.m. at this point. He said he walked to Broadway Liquor Store and bought a half-pint of whiskey and then walked back to the house. He said that he drank the entire half-pint in approximately one hour.

At around 11:00 p.m., the Defendant decided to go to Hank's Bar. In the parking lot before he entered the bar, he met a man and a woman who were sitting in their cars, one of which was the maroon Camaro that the Defendant was later seen driving. He asked if the couple had a light for his cigarette, and they provided it for him. The three struck up a conversation and then began drinking whiskey that the couple had with them. The Defendant said he sat in the driver's seat of the Camaro, noting that there were rims and tires in the car and that the keys were in the ignition. The Defendant then smoked marijuana with the

-4-

couple.

The Defendant said that the woman was acting like the Camaro belonged to her. The couple asked him if he wanted to go with them to "party" for the night, and the Defendant agreed if someone would bring him home in the morning. The man then said that the woman was "kind of messed up pretty good" and asked the Defendant to drive her Camaro. He told the Defendant that he would ride as a passenger and that the woman could drive his truck back to the house. The Defendant said the woman got her pocketbook out of the Camaro and also retrieved something from the glove box.

The Defendant testified that after the man got into the passenger seat, he started the Camaro. The Defendant recalled that the car was powerful and the gas pedal was "tight," so that when he pushed the gas pedal "it kind [of] goosed it," causing him to "sho[o]t out of the bar" parking lot. The man instructed the Defendant to go to the left, so the Defendant drove through a gas station parking lot and then made a right to head in the direction the man had indicated. The Defendant recalled that there was static on the radio station and that he attempted to tune the radio, which caused him to go outside of his lane of traffic. He said that he then noted that the blue lights of a police car were activated behind him. The Defendant said he activated his turn signal and slowed down to pull over.

The Defendant said that the man with him then smacked him in the face with a pistol and told him to drive. He said that this bruised the right side of his face, as shown in the photograph police took of him later that evening. The Defendant said the man said, "Don't get me caught in this car," pointed the gun at him, and insisted he drive. The Defendant said that, at that point, he knew something was not right. He said he drove while the man kept the gun pointed at his face. The Defendant said he swerved into the oncoming lane of traffic because the man told him, "do not let none of them get up beside me and see me in this car." He said he was worried about getting into an accident and the gun going off. The man told the Defendant to make a left because the man was going to get out of the car. The Defendant said he was traveling 110 mph at that point, and one of the tires of the Camaro blew out. The Defendant insisted that there was a man in the front passenger seat when he crashed and also that there was no tire in the front seat before the crash. He offered a guess that, as a result of the crash, a tire from the back seat landed in the front seat.

During cross-examination, the Defendant agreed he was under the influence when he was driving that night and that he was driving on a suspended license. He agreed that he had previously been convicted of driving on a suspended license on three prior occasions. The Defendant denied that he told Officer Ford that the man with him waved a gun at him when they were at the Shell gas station, so he jumped in the driver's seat and drove away. The Defendant then said that he had, in fact, told the officer that he got "smacked" with a gun

while he was at the Shell station. The Defendant agreed he had been previously convicted of felonies on October 1, 2009, March 11, 2004, and March 17, 2000.

In rebuttal, Deputy Shaun Lester testified that, after this crash, he went to the passenger side of the car and lifted the handle of the door. The handle "popped" out of his hand, and he had to break the passenger's side window to search the Camaro. Deputy Lester looked in the Camaro to see if there was anyone else inside, and he did not see anyone.

Based upon this evidence, the jury convicted the Defendant of one count of burglary, two counts of theft of property, felony evading arrest, reckless endangerment, driving under the influence of an intoxicant, and driving on a canceled, revoked, or suspended license. It is from these judgments that the Defendant now appeals.

## II. Analysis

On appeal, the Defendant concedes that he "was witnessed by law enforcement officers driving a stolen vehicle, possessing stolen tires and rims, evading arrest, driving under the influence, and driving on a suspended license." He contends, however, that no one witnessed him "burglarizing Vic Jenkins Chevrolet, [a] crime for which he was sentenced to serve twelve (12) years." The Defendant contends that the State did not provide him with any of the photographs of the dusty footprints on the floor of the auto shop, violating *Brady v. Maryland*, 373 U.S. 83, 87 (1963). He asserts that none of the footprints matched his, and this evidence was therefore exculpatory. The State counters that the Defendant failed to preserve this issue because his motion for new trial was not timely filed. The State concedes that the Defendant raised the issue in the motion for new trial but asserts that the motion's untimeliness renders this Court unable to review the issue. Further, the State contends that the Defendant has failed to show how the footprints, if disclosed, would have impacted the jury's verdict.

## A. Waiver

The Defendant was convicted of the charged offenses on June 29, 2011, and he was sentenced on August 12, 2011. On September 20, 2011, the Defendant's counsel filed a motion for extension of time to file a motion for new trial. New counsel for the Defendant filed a motion seeking an extension of time to file a motion for new trial, which the trial court granted. The Defendant's new counsel filed the motion for new trial on October 28, 2011.

Our rules of criminal procedure provide that "[a] motion for a new trial shall be in writing or, if made orally in open court, be reduced to writing, within thirty days of the date the order of sentence is entered." Tenn. R. Crim. P. 33(b). "[T]his thirty day period is

jurisdictional and *cannot* be expanded." *State v. Hatcher*, 310 S.W.3d 788, 800 (Tenn. 2010)(emphasis added). Thus, "[a] trial judge does not have jurisdiction to hear and determine the merits of a motion for a new trial which has not been timely filed." *State v. Bough*, 152 S.W.3d 453, 460 (Tenn. 2004). In this case, the motion for new trial was filed more than two months after the judgment was entered. Nevertheless, the trial court conducted a hearing on the merits of the motion. As a result of the untimely filed motion for new trial, the trial court was without jurisdiction to consider the motion. *See State v. Dodson*, 780 S.W.2d 778, 780 (Tenn. Crim. App. 1989). Additionally, "[i]f a motion for new trial is not timely filed, all issues are deemed waived except for sufficiency of evidence and sentencing." *Bough*, 152 S.W.3d at 460.

Moreover, a notice of appeal must be filed "within 30 days after the date of entry of the judgment appealed from." Tenn. R. App. P. 4(a). An untimely motion for new trial will not toll this thirty-day period. *See* Tenn. R. App. P. 4(c); *State v. Davis*, 748 S.W.2d 206, 207 (Tenn. Crim. App. 1987). Here, the notice of appeal was filed more than thirty days after judgment was entered. However, "in all criminal cases the 'notice of appeal' document is not jurisdictional and the filing of such document may be waived in the interest of justice." Tenn. R. App. P. 4(a).

Unlike other rules of procedure, Rule 33 does not contain a provision for untimely filed motions for new trial. *See, e.g.*, Tenn. R. Crim. P. 32(f) (withdrawal of guilty plea allowed "for any fair and just reason" before sentence is imposed or "to correct manifest injustice" after judgment entered but before it becomes final); Tenn. R. App. P. 4(a) (in criminal cases, "notice of appeal" document is not jurisdictional and filing may be waived "in the interest of justice"). While this Court may waive the untimely filing of the notice of appeal, we do not have the authority to waive the untimely filing of a motion for new trial. *State v. Martin*, 940 S.W.2d 567, 569 (Tenn. 1997); *State v. Stephens*, 264 S.W.3d 719, 728 (Tenn. Crim. App. 2007); *see also* Tenn. R. App. P. 4(a).

As previously noted, if a motion for new trial is not filed within the mandatory thirty-day period, all issues are deemed waived except for sufficiency of the evidence and sentencing. *Bough*, 152 S.W.3d at 460; *Martin*, 940 S.W.2d.at 569. None of the issues raised by the Defendant involve sufficiency of the evidence or sentencing. As such, for the purpose of our appellate review, all of the Defendant's issues are waived. *See, e.g., Melissa L. Grayson*, No. M2011-00648-CCA-R3-CD, 2012 WL 3611821, at *10-11 (Tenn. Crim. App., at Nashville, Aug. 20, 2012), *no Tenn. R. App. P. 11 application filed.* This Court, however, may review issues normally waived pursuant to the plain error doctrine. Tenn. R. App. P. 36(b).

**B. Plain Error**

This Court may review an issue which would ordinarily be considered waived if the Court finds plain error in the record. For example, this Court may consider errors affecting the substantial rights of the defendant if review is necessary to do substantial justice. Because, according to Tennessee Rule of Appellate Procedure 13(b), "[r]eview generally will extend only to those issues presented for review," we may review the issues presented by the Defendant herein pursuant to Tennessee Rule of Appellate Procedure 36(b), which states that "[w]hen necessary to do substantial justice, an appellate court may consider an error that has affected the substantial rights of a party at any time, even though the error was not raised in the motion for a new trial or assigned as error on appeal."

A court will grant relief for plain error pursuant to Rule 36(b) of the Tennessee Rules of Appellate Procedure only when: "(1) the record clearly establishes what occurred in the trial court; (2) the error breached a clear and unequivocal rule of law; (3) the error adversely affected a substantial right of the complaining party; (4) the error was not waived for tactical purposes; and (5) substantial justice is at stake; that is, the error was so significant that it 'probably changed the outcome of the trial.'" *State v. Hatcher*, 310 S.W.3d 788, 808 (Tenn. 2010) (citing *State v. Smith*, 24 S.W.3d 274, 282-83 (Tenn. 2000) (quoting *State v. Adkisson*, 899 S.W.2d 626, 642 (Tenn. Crim. App. 1994)). "If any of these five criteria are not met, we will not grant relief, and complete consideration of all five factors is not necessary when it is clear from the record that at least one of the factors cannot be established." *Id.* "The party claiming plain error has the burden of persuading the appellate court. *Id.* (citing *State v. Banks*, 271 S.W.3d 90, 119 (Tenn. 2008)).

In *Brady v. Maryland*, the United States Supreme Court held, "We now hold that the suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution." 373 U.S. 83, 87 (1963). Evidence that is "favorable to an accused" includes both "evidence deemed to be exculpatory in nature and evidence that could be used to impeach the [S]tate's witnesses." *Johnson v. State*, 38 S.W.3d 52, 55-56 (Tenn. 2001). Favorable evidence has also been defined as:

> evidence which provides some significant aid to the defendant's case, whether it furnishes corroboration of the defendant's story, calls into question a material, although not indispensable, element of the prosecution's version of the events, or challenges the credibility of a key prosecution witness.

*Johnson*, 38 S.W.3d at 56-57 (quoting *Commonwealth v. Ellison*, 376 Mass. 1, 379 N.E.2d 560, 571 (1978)). The State has an obligation to disclose "'any favorable evidence known to the others acting on the government's behalf in the case, including police.'" *Johnson*, 38 S.W.3d at 56 (quoting *Strickler v. Green*, 527 U.S. 263, 275 n.12 (1999)). Additionally,

"The duty to disclose exculpatory evidence extends to all 'favorable information' irrespective of whether the evidence is admissible at trial." *State v. Robinson*, 146 S.W.3d 469, 512 (Tenn.2004) (citing *Johnson*, 38 S.W.3d at 56).

A defendant must prove the following four prerequisites in order to establish a violation of due process under *Brady*:

> 1. The defendant must have requested the information (unless the evidence is obviously exculpatory, in which case the State is bound to release the information whether requested or not);
>
> 2. The State must have suppressed the information;
>
> 3. The information must have been favorable to the accused; and
>
> 4. The information must have been material.

*State v. Edgin*, 902 S.W.2d 387, 389 (Tenn. 1995). The defendant must prove a due process violation by a preponderance of the evidence. *Id.* (citing *State v. Spurlock*, 874 S.W.2d 602, 610 (Tenn. Crim. App. 1993)). The Tennessee Supreme Court defined "material" within the context of *Brady*:

> Evidence is deemed to be material when "there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different." . . . [A] reviewing court must determine whether the defendant has shown that "the favorable evidence could reasonably be taken to put the whole case in such a different light as to undermine the confidence of the verdict." In other words, evidence is material when, because of its absence, the defendant failed to receive a fair trial, "understood as a trial resulting in a verdict worthy of confidence."

*Johnson*, 38 S.W.3d at 58 (citations omitted).

At the motion for new trial, the Defendant's counsel alleged that the State withheld exculpatory evidence because it failed to provide him copies of electrostatic lifts of footprints that were made at the scene.[2] During the investigation, law enforcement officers gathered fingerprints and footprints from Vic's Automotive collision repair center. The officers did

---

[2] The record indicates that the Defendant's counsel also argued that the State failed to provide fingerprints lifted from the scene, but the Defendant does not raise that issue in his brief.

not send these footprints or fingerprints for further testing or comparison, thinking it unnecessary.

We conclude that the Defendant has not proven that the State committed a *Brady* violation. The State's theory of the case included that the police officer saw the Defendant drive away from Vic's Automotive in the Camaro. The officer followed him, never losing sight of him for a significant period of time, and the Defendant ultimately crashed the Camaro. After he crashed, officers approached the Camaro, in which the Defendant's foot was caught. There was no one in the passenger's seat, and there was a tire and rim of a car located in the front passenger seat. At trial, the Defendant presented a theory of defense based upon the fact that another man stole the car and later forced the Defendant, at gun point, to drive the car. Police officers refuted that they saw the Defendant exiting the bar parking lot rather than the Vic's Automotive parking lot.

Under this set of facts, law enforcement officers did not send the footprints for further testing, deeming it an unnecessary expense. Neither these officers nor the State is required to anticipate the Defendant's seemingly far-fetched defense. We conclude that the footprint evidence is not material because there is not a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different. *See Johnson*, 38 S.W.3d at 58. Accordingly, the issue presented is not one that requires our review pursuant to the plain error doctrine. The Defendant is not entitled to relief.

### III. Conclusion

Based on the foregoing reasoning and authorities, we affirm the judgments of the trial court.

_____
ROBERT W. WEDEMEYER, JUDGE