IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT KNOXVILLE
April 29, 2003 Session

## STATE OF TENNESSEE v. GROVER DONNELL COWART

**Direct Appeal from the Criminal Court for Knox County
No. 73285     Mary Beth Leibowitz, Judge**

_____

**No. E2002-02232-CCA-R3-PC
June 27, 2003**
_____

This is an appeal from the trial court's denial of post-conviction relief. The Defendant, Grover Donnell Cowart, was originally convicted by a jury of attempted first degree premeditated murder and especially aggravated robbery; the jury acquitted the Defendant of additional charges of aggravated rape. On direct appeal, this Court reversed and remanded for retrial the Defendant's conviction of attempted first degree murder. See State v. Grover Donnell Cowart, No. 03C01-9512-CR-00402, 1999 WL 5174, at *1 (Tenn. Crim. App., Knoxville, Jan. 8, 1999). The Defendant subsequently filed for post-conviction relief with respect to the judgment of especially aggravated robbery, alleging that the State failed to disclose exculpatory evidence in violation of Brady v. Maryland, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963). After an evidentiary hearing, the trial court denied relief. We affirm the judgment of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court Affirmed**

DAVID H. WELLES, J., delivered the opinion of the court, in which JERRY L. SMITH and ROBERT W. WEDEMEYER, JJ., joined.

Doug Trant, Knoxville, Tennessee, for the appellant, Grover Donnell Cowart.

Paul G. Summers, Attorney General and Reporter; Brent C. Cherry, Assistant Attorney General; Randall E. Nichols, District Attorney General; and Marsha Mitchell, Assistant District Attorney General, for the appellee, State of Tennessee.

**OPINION**

**FACTS**

Before we reach the merits of the Defendant's issues on appeal, a summary of the relevant facts adduced at the jury trial will be helpful. On direct examination, the victim, a young woman, testified that, on the night of September 24, 1992, the Defendant, her boyfriend, came over to her apartment at about 11:15 p.m. They talked for a few minutes, and then he stated that he was going

to leave. He went to her front door and unlocked the several locks. He then began kissing the victim, and they ended up in her bedroom. The Defendant removed the victim's panties, and they were sitting on the bed together when the victim saw the Defendant's friend and roommate, Milton Tucker, behind the Defendant. Tucker was pointing a gun towards the victim. She testified:

> And he pushes [the Defendant] out of the way, and [the Defendant] says, "Man, we don't have any money." So he pushes me back, and he ties my hands and my feet, and I seen [the Defendant] laying on the side of the bed, and he was saying some kind of prayer. And then I was rolled over onto my stomach, and Tucker tried to put some tape around my eyes and my lips, but it wouldn't stick. And, ah, the next thing I heard was somebody messing with a belt buckle. And someone tried to insert themselves from that position, but they couldn't because my legs were so tight together, and then I was rolled over onto my back again, and a pillow was put over my head, and my legs were untied a little bit, and that's when I was raped. And then someone retaped them again. Then I heard a noise a little ways from the bedroom, and I heard [the Defendant] say again, "Man, I told you we don't have any money." And then I heard, in the kitchen, my refrigerator door open, and Tucker said, "Do you have anything to drink, bitch?" And I said, "No," and then I heard someone going through my silverware, and then, then Tucker's voice was in the bedroom, and he said, "Where is your purse?" And I said, "It's on my dresser." So, I heard him going through my purse and my keys, and Tucker said, "Did you like it?" And I said, "Yes," because I was afraid if I said no it would happen again. And then he said, "Well, why did you cry?" And I never did answer him. So, I was rolled back over onto my stomach again, and I asked, I asked, I said, "Would you please untie my hands a little bit." I said, "They are numb, I can't feel them anymore." And he said, Tucker said, "Well, I'll see what I can do about that." And I laid there for, I don't know how long. The next thing I know my head was lifted and I seen a white towel go around my neck, and I was cut, and then I was stabbed on my left side and my right side. And then I heard Tucker say something about my phone, and then he cut my cord. And then I didn't hear anything after that for a few more minutes, I just laid there, I didn't move, and then I felt someone poke at my feet with a very sharp object. And I still didn't move, and Tucker's voice said, "Remember, Kim, I see you every day, I know everything you do, and everywhere you go, and if you stick your head out this door I'll blow your brains out." And then I laid there a few more minutes, and I heard my car start.

The victim was subsequently able to summon help from her neighbors and was taken to the hospital for treatment. Due to the extent of her injuries, she remained in the hospital for over two weeks.

The victim testified that it was Tucker who initially tied her up. She was then rolled over onto her stomach. At that point in time, she testified, she did not know where the Defendant was, and did not see him during the remainder of the assault. When she was rolled back over to her back prior to being raped, someone placed a pillow over her face; accordingly, she could not see who

raped her. She also did not see who cut her because she had been rolled back over onto her stomach by that time.

On cross-examination, the victim testified that, while she and the Defendant were hugging and kissing, she did not feel any weapons on him. She reiterated that Tucker had initially tied her up and rolled her onto her stomach but maintained that she did not know who actually raped her. She admitted, however, telling the police on October 15, 1992:[1]

> then I was, like, Oh, my God, you know, and [Tucker] tied my hands up, over my head, and tied my feet together with that tape, put a gun to my head, and he tried to put a pillow over my face, but he had a hard time holding it in one position . . . and I could see figures of him through my bed, because I've got mirrors on my headboard . . . and . . . so he rolled me over . . . and I heard him undo his belt . . . and he tried to insert himself, but he couldn't because my legs were so tight together, so he rolled me back over on my back, and he undid my legs a little bit so they could spread apart, and that is when he raped me . . . and then he tied my feet back together, tighter and he rolled me back over on my stomach . . . and . . . heard him . . . he went into the kitchen, and he was going through some silverware, or something, and I heard him say something to [the Defendant], and [the Defendant] said, "Man, we don't have no money." Then he asked me, he said, "Do you have anything to drink, bitch?"

Mr. James Burns testified that he was the victim's next door neighbor. He assisted her immediately after the assault and testified that she said to him, "I can't believe he did it, I can't believe he did it." When Mr. Burns asked her who "he" was, she said, "Jazz," the Defendant's nickname. Mr. Burns also testified that he knew where the victim had parked her car that night in front of the apartments, and that it was gone at the time he was assisting the victim. Mr. Burns relayed this information to the first police officer on the scene, and also gave a description of the vehicle. When the police officer asked for the license plate number, Mr. Burns obtained that information from the victim.

Officer Russell Michael Saylor was the first officer on the scene. He spoke with Mr. Burns and called dispatch with the information about the victim's missing car. He also called repeatedly for an ambulance and secured the scene.

Officer Kenneth Slagle testified that, on the night in question, he saw the victim's car on the side of the road near the victim's apartment building with its lights out. He viewed the license plate number and thereby verified that it was the car on which dispatch had issued a bulletin. The car left as he was verifying its identity, and he subsequently followed it and pulled it over. At that point, Milton Tucker jumped out of the car and began running toward Officer Slagle. Officer Slagle drew his gun and ordered Tucker to "spread eagle" on the back of the car. Tucker did so and was subsequently taken into custody. After Tucker had been placed in the patrol car, Officer Slagle

---

[1]A transcript of the victim's eight page statement to the police was admitted at trial and provided to the jury.

examined the interior of the car. In the right front seat he saw a semiautomatic gun, car keys, a purse, duct tape, and a red ink pen. Officer Slagle testified that he did not see the Defendant that night.

Detective Michael Kenneth Hyde spoke briefly with the victim while she was in the emergency room "near death." He testified that she told him that she had been raped and robbed and cut by a black man whom she did not know. She identified a second man involved as the Defendant.

After the assault on the victim, the Defendant went to Chicago. There, he was apprehended by Chicago police officers acting on an arrest warrant issued by a court in Knoxville, Tennessee. The warrant stated only that the Defendant was wanted on charges of aggravated rape and aggravated robbery. Officer Xavier Castro assisted in taking the Defendant into custody. Officer Castro testified that he and another officer found the Defendant and his brother in an apartment. When the officers entered the apartment, the Defendant's brother became very upset. In order to calm him down, the Defendant told his brother that the officers were there for him, the Defendant. Officer Castro testified that the Defendant's brother asked him what he had done, and the Defendant responded, "I killed her, I killed her."

Officer Castro further testified that, while he was accompanying the Defendant to the police car, the Defendant asked him, "Is she alive?" Officer Castro knew nothing about the details of the crimes underlying the Knoxville arrest warrant, and responded simply by asking the Defendant to cooperate. Officer Castro sat in the back seat of the car with the Defendant, and they were driven to the police station by Detective Guswiler. During the twenty-minute drive, the Defendant kept asking about the condition of the woman in Knoxville. Officer Castro told the Defendant he did not know what the Defendant was talking about, and the Defendant said, "Well, I know how you knew where I was at." At this point, Officer Castro read the Defendant his rights, and the Defendant then informed Officer Castro that the officers knew where to find him because Milton Tucker had informed on him. The Defendant then recited a narrative about how he and Tucker had committed a robbery in Knoxville. Officer Castro testified that the Defendant explained that he and Tucker were both from Chicago and needed money and a vehicle to return to Chicago from Knoxville. The Defendant thought they could get both from the victim. Officer Castro testified, "They were going to do this by, since she was [the Defendant's] friend, he was going to gain her trust and get into the apartment. Then Mr. Tucker was going to come into the apartment and act as a robber. [The Defendant] was then going to control the girl so that she wouldn't resist the robbery. They were going to take the automobile and any money that she had and return to Chicago." The Defendant told Officer Castro that, after they left the apartment, Tucker insisted on driving the victim's car; the Defendant left in another vehicle. The Defendant subsequently saw Tucker being taken into police custody, and so drove on to Chicago by himself. The Defendant also told Officer Castro during the ride to the station that Tucker had "turned violent" while in the victim's apartment, and that Tucker had raped the victim, cut her throat, bound her, and fled.

At the station, the Defendant indicated that he wanted to make another statement. Officer Castro was accompanied by Detective Guswiler and Officer Clemens while the Defendant made this subsequent statement. Officer Castro testified about this second statement:

> This time he says that he had planned, with Tucker, to enter the victim's apartment, rob her of her car and money. That he was going to act as a victim but allow access to the apartment, and he told us, through an open window, that he would leave something unlocked. And that the original plan was to leave the window unlocked.
>
> He was in the apartment with the victim, this was [the Defendant], for some time when Mr. Tucker entered. Mr. Tucker then came in acting as a robbery. [The Defendant] was controlling the victim. Mr. Tucker then restrained the victim by tying her up with duct tape. Then he began attacking her. When he attacked her [the Defendant] then said that he got into the violence of the act. At which time he admitted raping her. After he admitt[ed] raping her, ah, he then made the statement, "And I cut her throat."

The Defendant testified on his own behalf. He explained that Tucker had decided he wanted to return to Chicago and asked the Defendant if they could make the trip in the victim's car. The Defendant told Tucker that the victim would not let him borrow the car for the trip. Tucker then suggested that the Defendant visit the victim, unlock the door, put the car keys on a table, and occupy the victim in the bedroom so that Tucker could enter the apartment and take the car keys. The Defendant explained that the original plan was for both of them to return later with the keys and take the victim's car.

The Defendant testified that, when he and the victim were on the victim's bed and she screamed, the Defendant saw a man with the lower half of his face covered with a cloth. The Defendant stated that he did not know who the man was and was scared because the man had a gun. The man bound his arms and legs with tape and then, using a headlock, dragged the Defendant out of the bedroom. The man then raped the victim. After the rape, the man pulled down the cloth covering his face, and the Defendant discovered that it was Tucker. The Defendant argued with Tucker about what he had done and initially refused to leave with Tucker. The Defendant testified that Tucker then aimed the gun at him and cocked it, at which point the Defendant decided to cooperate. The Defendant left with Tucker and eventually saw Tucker being apprehended by the police while Tucker was driving the victim's car. The Defendant then borrowed another car and drove to Chicago.

The Defendant denied raping or cutting the victim. He also stated that he did not know that Tucker had cut the victim's throat until after he was arrested. He testified that Officer Castro asked him if he had raped the victim, to which he replied, "No." Officer Castro then asked if Tucker had raped the victim, to which he replied, "Yes." The Defendant further testified that Officer Castro had asked him if he had cut the victim. The Defendant replied, "No, I don't know anything about that." The officer then asked him if Tucker had cut the victim. The Defendant replied, "I told you, I didn't

know anything about it." The Defendant denied having told the Chicago police that he raped, cut, or killed the victim. He claimed that his only participation in the crime was unlocking the victim's door and distracting her so that Tucker could enter the apartment and take the victim's car keys.

On the basis of this proof, the jury convicted the Defendant of one count of attempted first degree premeditated murder and one count of especially aggravated robbery. On direct appeal, this Court reversed the Defendant's conviction of attempted murder on the basis of an error in the trial court's jury instructions.[2] On this appeal, the only conviction which is challenged is the Defendant's conviction of especially aggravated robbery.

## BRADY CLAIM

In his post-conviction petition, the Defendant alleges that the State failed to disclose to him exculpatory evidence as required under Brady v. Maryland, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963). In Brady, the United States Supreme Court held that the prosecution in a criminal case must furnish to the accused exculpatory evidence pertaining to the accused's guilt or innocence or to the potential punishment that may be imposed. Specifically, the Court held that "suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution." Id., 373 U.S. at 87. Evidence that is potentially useful in the impeachment of a prosecution witness must also be disclosed. See Giglio v. United States, 405 U.S. 150, 154, 92 S.Ct. 763, 31 L.Ed.2d 104 (1972). See also, Johnson v. State, 38 S.W.3d 52, 55-6 (Tenn. 2001) ("Evidence 'favorable to the accused' includes . . . evidence that could be used to impeach the state's witnesses.") To establish that the prosecution has violated the constitutional requirements of Brady, a defendant must establish four prerequisites: (1) that the defendant requested the information; however if the evidence is obviously exculpatory, the State must reveal the information even if not requested; (2) the prosecution suppressed the information; (3) the information was favorable to the accused; and (4) the information was material. See id., 38 S.W.3d at 56.

In this case, the evidence alleged to have been withheld in violation of Brady consists of written notes prepared by various persons in conjunction with the investigation and prosecution of the charges against the Defendant. The Defendant's trial attorney testified at the post-conviction hearing that he never received a copy of these notes prior to trial; the trial court accredited this testimony. Defense counsel further testified that these notes would have been very significant in his cross-examination of the victim and would have assisted in casting doubt on the credibility of her testimony. They would further have corroborated the Defendant's theory of defense.

The trial court determined that the first three elements of a Brady violation were established. However, the trial court further concluded that the exculpatory evidence was not "material" as required by Brady, and that the Defendant was therefore not entitled to a new trial. Evidence meets the definition of "material" "only if there is a reasonable probability that, had the evidence been

---

[2]The State subsequently nolled the attempted murder charge.

-6-

disclosed to the defense, the result of the proceeding would have been different." United States v. Bagley, 473 U.S. 667, 682, 105 S.Ct. 3375, 87 L.Ed.2d 481 (1985). Stated another way,

> The question is not whether the defendant would more likely than not have received a different verdict with the evidence, but whether in its absence he received a fair trial, understood as a trial resulting in a verdict worthy of confidence. A "reasonable probability" of a different result is accordingly shown when the government's evidentiary suppression "undermines confidence in the outcome of the trial."

Kyles v. Whitley, 514 U.S. 419, 434, 115 S.Ct. 1555, 131 L.Ed.2d 490 (1995) (quoting Bagley, 473 U.S. at 678). See also Johnson, 38 S.W.3d at 58. Thus, the issue before this Court is whether the trial court erred in determining that the undisclosed evidence was not material.

The notes which are the subject of this action consist of the following: (1) the prosecuting attorney's handwritten notes taken during an interview with the victim on May 17, 1993; (2) handwritten notes taken by another prosecutor during an interview with the victim on September 24, 1992; (3) a typewritten summary about the assault, undated, prepared by Patty Bordwine;[3] and (4) a handwritten statement prepared on September 24, 1992, by Officer Michael S. Cunningham about what Tucker told him about the assault following Cunningham's arrest of Tucker.

The Defendant contends that the first of these documents is material in that the prosecuting attorney's notes reflecting the interview with the victim provide, in pertinent part,

> Tucker then standing in bedroom w/ gun: Cowart started praying. Tucker tied v hands & ankles w duck tape. Put pillow over v's face. Tried to put tape on mouth. Heard Tucker undo pants. V on stomach. Rolled v on back. Put pillow over face w/ gun. Then, after penetration, asked "Do you have anything to drink bitch." . . . Tucker cut v. neck & stabbed in chest twice. Then, later, poked v in feet several times.

That is, these notes appear to indicate that, during the interview, the victim identified Tucker as the man who raped and cut her. Similarly, the notes taken by the other prosecutor provide, in pertinent part, as follows:

> looked up and Tucker had gun.
> "If you look at me I'll kill you"
> "Give me your money"
> rolled V on stomach
> taped wrists together -- [the Defendant] praying
> taped ankles together.

---

[3]The summary does not identify its author. The prosecuting attorney testified at the post-conviction hearing that he surmised that Patty Bordwine with the sexual assault crisis center was the author.

pillow over head - "Don't look at me"
Tucker undid belt - [the Defendant] left room.
Tried to insert - too tight
rolled over - penetration

The typed summary provides:

> As Kim and [the Defendant] lie on her bed, TUCKER bursts into the bedroom, puts handgun at Kim's head, calls her "Bitch" and tells her "If you look up, I'll kill you." TUCKER beg[i]ns to tape her up with electric tape as [the Defendant] begins to pray in the floor, explaining to TUCKER that he and Kim have no money etc.
> Kim does not actually see [the Defendant] again after this point but does hear him in her living room as TUCKER'S assault against her progressed.
> Although TUCKER put tape over Kim's eyes, the tape falls off early in the assault. Kim is able to articulate the manner in which TUCKER proceeds to victimize her from this point forward.

Finally, Officer Cunningham's statement provides, in pertinent part, that

> It was explained to Mr. Tucker that he was the suspect in a cutting and rape of a white female. Mr. Tucker stated that Mr. Cowart had brought him the car he was driving and had stated that the police was after him. Mr. Tucker stated that he and Mr. Cowart were headed to Chicago with Mr. Cowart. Mr. Tucker stated that he did not know anything about the victim.

The Defendant contends that all of these documents establish that, prior to trial, the victim identified Tucker as her assailant, and that, had his trial counsel been aware of these reports, the victim's credibility could have been more effectively impeached, thereby bolstering his own theory that his participation in the offenses was limited to assisting in a nonviolent theft of the victim's car.

To address the Defendant's contentions, we look first to the definition of the crime at issue: especially aggravated robbery. An especially aggravated robbery is the intentional or knowing theft of property from the person of another by violence or putting the person in fear, accomplished with a deadly weapon and where the victim suffers serious bodily injury. See Tenn. Code Ann. § 39-13-403(a). There is no question in this case that the victim was the subject of an especially aggravated robbery. Furthermore, the Defendant admitted to his participation in the theft of the victim's car. Therefore, the only question is the extent to which the Defendant participated in the remaining elements of the crime: violence involving the use of a deadly weapon resulting in serious bodily injury to the victim.

The Defendant contends that his participation was limited to assisting in the commission of a simple theft of the victim's car, by unlocking her door and distracting her with sexual activity, in

order to allow Tucker to enter her apartment and retrieve her car keys. The jury, obviously, determined that the Defendant was involved in the violent assault upon the victim, raising the theft to an especially aggravated robbery. We must determine whether there is a reasonable probability that the jury's verdict would have been different had defense counsel been given access to the documents at issue prior to trial.

The Defendant argues that the victim's credibility could have been more thoroughly impeached had defense counsel had access to the documents at issue. When the victim asserted at trial that she did not know who raped and cut her, defense counsel could have used the documents to establish that, prior to trial, she said that her assailant was Tucker. However, defense counsel did have access to the statement the victim made to Det. Hyde while she was in the emergency room, in which she identified Tucker (the man "she did not know") as the man who raped and cut her. Defense counsel also had access to the victim's eight page statement subsequently given to the police which indicates that the victim again identified Tucker as her assailant. Indeed, defense counsel used this statement to good effect during his cross-examination of the victim: the jury acquitted the Defendant of raping the victim. In essence, the documents now at issue were merely cumulative to this information. Brady does not require the disclosure of information already possessed by the defendant. See Johnson, 38 S.W.3d at 56 (noting that "the 'prosecution is not required to disclose information that the accused already possesses or is able to obtain,'" quoting State v. Marshall, 845 S.W.2d 228, 233 (Tenn. Crim. App. 1992)).

Moreover, even if defense counsel, with the assistance of the documents at issue, had been able to further discredit the victim's trial testimony, the jury still had ample evidence upon which to convict the Defendant of especially aggravated robbery. Officer Castro testified that the Defendant admitted to being involved in the violence committed against the victim. The Defendant denied making the statements testified to by Officer Castro. Obviously, the jury accredited Officer Castro's testimony and disbelieved the Defendant's version of events. This was the jury's prerogative, and we are confident that the jury's decision would have been the same even had defense counsel been given copies of the notes at issue.

The Defendant attempted to demonstrate that the jury would have decided the case differently by calling to the stand a juror who participated in the Defendant's trial. Counsel for the Defendant advised the court that this juror had reviewed the documents at issue and that, if allowed, he would testify that, if he had had the benefit of hearing the victim cross-examined on the basis of these documents, he would not have convicted the Defendant of anything more than simple robbery. The State strenuously objected to this proffered witness being allowed to testify. After significant discussion, the trial court ruled that the juror would not be allowed to testify on the grounds that such testimony is barred by Tennessee Rule of Evidence 606(b). The Defendant now contends that the trial court's ruling was in error, arguing that this rule of evidence should yield to the necessity of proving a Brady violation in order to sustain his claim for post-conviction relief.

In pertinent part, Rule 606(b) provides:

> Upon an inquiry into the validity of a verdict . . . , a juror may not testify as to any matter or statement occurring during the course of the jury's deliberations or to the effect of anything upon any juror's mind or emotions as influencing that juror to assent to or dissent from the verdict . . . or concerning the juror's mental processes . . . .

Tenn. R. Evid. 606(b). We agree with the trial court that this Rule prohibits the proffered testimony.

Moreover, we are not persuaded that this Rule should be disregarded in the context of a post-conviction petitioner's attempt to prove that he or she suffered a constitutional violation. In this case, a finding that the suppressed information was "material" would have satisfied the Defendant's burden to prove that he had suffered a constitutional violation. As set forth above, the suppressed information would be deemed "material" only if we were convinced that "there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different." United States v. Bagley, 473 U.S. at 682. Neither this Court, nor the trial courts posited to make an initial finding, require the testimony of jurors in order to make this determination. Indeed, trial courts and this Court frequently make such determinations without the benefit of juror testimony in the context of claims of ineffective assistance of counsel. See Strickland v. Washington, 466 U.S. 668, 694, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984) (requiring that, before a defendant is entitled to a new trial on the basis of ineffective assistance of counsel, he or she must demonstrate that there is "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different.") Accordingly, we reject the Defendant's contention that Tennessee Rule of Evidence 606(b) should not be applied in the context of attempts to prove that suppressed exculpatory information is "material."

In sum, we agree with the trial court that the suppressed exculpatory information at issue in this case is not material so as to establish a violation of the constitutional principles set forth in Brady v. Maryland. Accordingly, the Defendant has failed to establish his claim for relief under the post-conviction act. The judgment of the trial court dismissing the Defendant's petition is affirmed.

 

_____
DAVID H. WELLES, JUDGE