IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT JACKSON

Assigned on Briefs December 9, 2015

**STATE OF TENNESSEE v. DARIUN BAILEY**

**Appeal from the Criminal Court for Shelby County**
**No. 1302737  James C. Beasley, Jr., Judge**

_____

**No. W2015-00542-CCA-R3-CD  -  Filed June 29, 2016**

_____

Following a jury trial in Shelby County, Defendant, Dariun Bailey, was convicted of second degree murder, aggravated assault, and reckless endangerment. He received concurrent sentences of twenty-two years for second degree murder, three years for aggravated assault, and two years for reckless endangerment.  On appeal, Defendant argues that the evidence was insufficient to support his convictions and that the State violated *Brady v. Maryland* by failing to notify him of the gunpowder residue kit and having the kit tested.  After a thorough review of the record, we affirm the judgments of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Criminal Court Affirmed**

THOMAS T. WOODALL, P.J., delivered the opinion of the Court, in which ALAN E. GLENN and ROBERT W. WEDEMEYER, JJ., joined.

Edwin C. Lenow, Memphis, Tennessee, for the appellant, Dariun Bailey.

Herbert H. Slatery III, Attorney General and Reporter; Jeffrey D. Zentner, Assistant Attorney General; Amy P. Weirich, District Attorney General; and Teresa McCusker, Assistant District Attorney General, for the Appellee, State of Tennessee.

**OPINION**

**Trial**

*State's Proof*

In February of 2013 Donnesha Adams was living at the Cedarwood Apartments with Defendant, who was her long-time boyfriend, and their two-month-old daughter, M.A. (In order to protect the privacy of victims who are minors, it is the policy of this

Court to refer to them by initials only). Ms. Adams testified that she and Defendant lived in the apartment together "[o]n and off." On February 20, 2013, Ms. Adams left the apartment at approximately 1:45 p.m. with Defendant and M.A. to go to work. She planned to drive Defendant to his grandmother's house on Merryville Street, and she was going to drive M.A. to Ms. Adams' mother's house so that her mother, Djana Bailey, could babysit.

When Ms. Adams arrived at Defendant's grandmother's house, she and Defendant had already been arguing in the car. Ms. Adams pulled up in front of the residence, and Defendant told her that she could not leave. He then removed her keys from the ignition and threw them in the street. Defendant eventually picked the keys up and placed them back in the ignition; however, he continued to tell Ms. Adams that she could not leave. She and Defendant continued arguing, and Defendant said that he wanted to keep M.A. with him for the day at the Merryville residence. Ms. Adams refused because the child did not have any of her supplies there. Everything was at Ms. Bailey's home. Ms. Adams and Defendant began tussling in the car over M.A.'s infant carrier. Defendant managed to get the child out of the car, and he took her into the house. He walked back outside and told Ms. Adams to go to work. Ms. Adams then refused to leave without her daughter. By then, Ms. Bailey had called several times. Defendant answered Ms. Adams' phone and told Ms. Bailey that Ms. Adams was on her way there. Ms. Adams also briefly spoke with Ms. Bailey and told her that Defendant had taken the child into the house. Defendant eventually brought M.A. back outside and strapped her back inside the car. Ms. Adams then attempted to leave but she and Defendant began arguing again over money.

Ms. Adams testified that Defendant pulled a black and silver gun from his pants and pointed it at her. She was "terrified." Ms. Adams then saw a red car drive up, and her brother, Antonio Adams, stepped out of the vehicle. Defendant thought that Ms. Adams had called her brother to the address, and he said, "[S]o that's how ya'll going to do it." Defendant and Mr. Adams, the victim, began fighting in the street, and Ms. Adams heard a gunshot. The victim "limped round" to the back of her car and got in on the passenger side. He did not tell Ms. Adams that he had been shot, and he said, "[L]et's go." She saw Defendant "dart" inside the house. As Ms. Adams attempted to restart her car after the engine stopped, Defendant walked up and shot out the passenger-side window of the vehicle where the victim was sitting. Ms. Adams was not sure how many times Defendant fired the weapon. She said that the gun Defendant used the second time was completely black. Ms. Adams testified that Defendant walked around the front of her car to the driver's side and told her to "move." Ms. Adams ducked, and Defendant shot the victim several more times. M.A. was in the back seat of the car during the shooting. Defendant then "ran off [ ] in the yard." The victim said that he was dying and told Ms. Adams to go. Ms. Adams drove the victim to Methodist North Hospital. She

2

said that as she drove, the victim kept falling over and knocking her car out of gear. She had to hold the victim with her shoulder and drive at the same time. They arrived at the hospital within five to seven minutes. The victim later died as a result of his wounds. Ms. Adams testified that she never saw the victim with a gun prior to the shooting.

Kenetria Young, the victim's girlfriend, testified that on February 20, 2013, Ms. Bailey, the victim's mother, called the victim and asked him to check on Ms. Adams because she was worried about Ms. Adams. Ms. Young and the victim picked up her son from school and then drove to Merryville Street. Ms. Young's other child was also in the car at the time. Ms. Young testified that they pulled up and saw Ms. Adams' car parked on the side of the street. Ms. Adams was sitting inside the car, and Defendant was standing to the side of the vehicle. Ms. Young parked her car, and the victim got out and closed the door. The victim walked toward Defendant, and the two men began "fist fighting." Eventually both men fell to the ground and were hitting each other. At that point, Ms. Young did not see a gun. Ms. Young testified that Defendant got up and ran into the house, and the victim got up and got into the car with Ms. Adams. Ms. Young said that Defendant walked back out of the house, stopped "middle ways of the yard," and he fired what Ms. Young thought was two or three shots. Defendant then walked to the car and kicked the window. Ms. Young testified that Defendant "ran around the front of the car to the driver's side. He opened the door[,] and he started firing shots." After that, Defendant ran back into the yard, and Ms. Adams drove away. Ms. Young called 911, and the operator instructed her to go to the hospital. Defendant remained standing in the yard.

Officer Kyle Craig of the Memphis Police Department testified that he responded to Methodist North Hospital on February 20, 2013. As he arrived, Ms. Adams drove up with the victim. Officer Craig spoke with Ms. Adams who was hysterical and worried about the victim. She told Officer Craig that "my boyfriend shot my brother." Officer Craig also saw a baby in the backseat of Ms. Adams' car. He secured the vehicle until the crime scene unit arrived at the hospital.

Officer Michael Spearman, a crime scene investigation (CSI) officer, collected four nine millimeter shell casings from the scene on Merryville Street. From there Officer Spearman drove to Methodist North Hospital and collected a bullet fragment taken from the victim and the victim's clothing. He also photographed Ms. Adams' car. Officer Spearman later returned to the Merryville address to assist in executing a search warrant. He collected a nine millimeter black High Point pistol located in the master bedroom inside of a black gun box. Officer Spearman also found a .32 caliber revolver in a shoe box under the couch in the "den area." Officer Hope Smith, also a CSI officer, testified that she processed Ms. Adams' car and located four bullet fragments in the car.

3

Special Agent Eric Warren, a forensic scientist with the Tennessee Bureau of Investigation (TBI) Crime Laboratory, Firearms Unit, testified that he examined two firearms (a High Point Model C9 pistol and a revolver), eight "live" rounds or cartridges, five bullet fragments, and four cartridge cases recovered in the present case. Special Agent Warren determined that the four cartridge cases were fired from the same weapon but not from the High Point Model C9 that he examined. He noted that the revolver was damaged and incapable of being fired. Special Agent Warren determined that four of the bullet fragments had characteristics of being fired from a High Point firearm. Due to the condition of the bullet fragments, Special Agent Warren could not say for certain that the bullets were fired from the High Point weapon that he examined. He also could not say for certain how many bullets were represented among the four fragments. Special Agent Warren testified that the fifth bullet fragment, recovered from the hospital, was larger than the other four. He determined that it and one of the other four fragments were fired from the same weapon.

Dr. Erica Curry performed an autopsy on the victim. She testified that the victim had a gunshot wound to the left side of his chest and four wounds to his right forearm. "Three of them were entrance wounds and one was an exit wound." The victim also had "two entrance gunshot wounds to his right thigh." Dr. Curry testified that she recovered five bullets and one fragment from the victim's body. There were abrasions, scratches, and bruises to various areas of the victim's body that "could be consistent" with being in a fist fight. Dr. Curry testified that the victim's body showed signs of "pseudo stippling" which meant that "a bullet travels through [an] intermediary target either on or another object before it actually hits the body." She agreed that the "pseudo stippling" could have been caused by the bullet striking a window. Dr. Curry noted that the victim's toxicology report was positive "for the metabolites of marijuana." She testified that the cause of the victim's death was multiple gunshots wounds, and the manner of death was homicide. Dr. Curry opined that the fatal wound was the one to the victim's chest.

*Defense Proof*

Traneka Moore testified that she was at 3578 Merryville Street on the day of the shooting. She said that Defendant had been outside with Ms. Adams, and the victim later arrived. The victim and Defendant then had an "altercation," and Ms. Moore later heard gunshots. She did not see who fired the weapon. Afterwards, Ms. Moore testified that Defendant ran into the house and appeared to be in shock. Ms. Moore said that after the shooting, she saw the victim get into the car with Ms. Young, and he then got back out and got into Ms. Adams' car. Ms. Moore testified that it appeared the victim was wrapping something in a white shirt.

4

On cross-examination, Ms. Moore admitted that she initially lied to police and told them that she did not know Defendant. She said that she lied because she was "scared at the time." She also did not tell police that she saw the victim arrive or that she saw an altercation between the victim and Defendant.

Darius Bailey, Defendant's brother, was also at the Merryville residence on February 20, 2013. He said that Defendant was living at the residence at the time. Mr. Bailey testified that Defendant and Ms. Adams had been arguing prior to the shooting about whether M.A. was going to stay at the residence with Defendant, and Mr. Bailey had been opening the door and checking on them every ten minutes. Mr. Bailey testified that at some point he heard gunshots, and Defendant "bust through the door saying this man's trying to kill me." He said that everyone was in shock, and got on the floor. He also said that Defendant did not come into the house to get a gun. Mr. Bailey testified that he looked out the door and saw the victim wrapping a gun up in a white shirt, and he handed it to Ms. Young. The victim then got into the car with Ms. Young who pulled away but then stopped. Mr. Bailey testified that the victim got out of Ms. Young's car and walked toward Defendant who was back outside. He said that Defendant and the victim "tussled," and the gun went off. Mr. Bailey admitted that he saw Defendant point a gun at Ms. Adams. He testified that Defendant picked up a gun that was lying in the grass and shot the victim. Mr. Bailey testified that he heard three to five gunshots. He said that the victim got into the car with Ms. Adams. Mr. Bailey testified that he did not see Defendant shoot into Ms. Adams' car.

Mr. Bailey claimed that Ms. Adams brought M.A. into the house and sat her down before the shooting. He said that Defendant and Ms. Adams were arguing because there were other females at the residence, and M.A. did not have any diapers or wipes there. At some point, Defendant and Ms. Adams went outside and continued arguing while Defendant placed M.A. in Ms. Adams' car. Mr. Bailey testified that he noticed a blue truck and a red car constantly driving past the house.

Defendant testified that he was living with his grandmother at 3578 Merryville Street on February 20, 2013. He said that he did not ride with Ms. Adams to the residence that morning and that Ms. Adams brought M.A. to the house for him to babysit. Defendant said that when Ms. Adams brought M.A. inside and saw that there were several females there, she changed her mind. Defendant then took M.A. back outside and placed her in Ms. Adams' car. He testified that he and Ms. Adams began arguing over his relationship with the women in the house.

Defendant testified that while he and Ms. Adams were arguing, the victim drove up with Ms. Young. He said that the victim approached him and said "that you going to keep you M.F'ng hands off my sister." Defendant testified that the victim, who was

5

much larger, hit Defendant, and they began fighting. He said that the victim got on top of him and continued beating him. Defendant testified that he saw the victim "go for a gun," and the victim got up and stood over him. Defendant testified that he got up, and the victim fell. Defendant said that he ran to the house, and the victim fired two shots at him. He got into the house and told his brother that the victim was trying to kill him.

Defendant testified that he grabbed a gun and went back outside. Defendant admitted that he shot the victim at least six times in several different places. He further admitted that the victim was seated in the passenger seat of Ms. Adams' car with the door closed when Defendant shot him. Defendant said that he was trying to protect his family and himself. He testified that he never pointed the weapon at Ms. Adams or M.A. Defendant testified that the victim had a silver revolver, and Defendant had a black automatic weapon. He did not believe that it was a High Point weapon. Defendant testified that he disposed of his weapon in the river after the shooting.

**Analysis**

I.      *Sufficiency of the Evidence*

Defendant argues that the evidence was insufficient to support his convictions for second degree murder, aggravated assault, and reckless endangerment. We disagree.

When an accused challenges the sufficiency of the convicting evidence, our standard of review is whether, after reviewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. *Jackson v. Virginia*, 99 S. Ct. 2781, 2789 (1979). The trier of fact, not this Court, resolves questions concerning the credibility of witnesses and the weight and value to be given the evidence as well as all factual issues raised by the evidence. *State v. Tuttle*, 914 S.W.2d 926, 932 (Tenn. Crim. App. 1995). Nor may this Court reweigh or re-evaluate the evidence. *State v. Cabbage*, 571 S.W.2d. 832, 835 (Tenn. 1978). On appeal, the State is entitled to the strongest legitimate view of the evidence and all inferences therefrom. *Id*. Because a verdict of guilt removes the presumption of innocence and replaces it with a presumption of guilt, the accused has the burden in this Court of illustrating why the evidence is insufficient to support the verdict returned by the trier of fact. *State v. Tuggle*, 639 S.W.2d 913, 914 (Tenn. 1982). "[D]irect and circumstantial evidence should be treated the same when weighing the sufficiency of [the] evidence." *State v. Dorantes*, 331 S.W.3d 370, 381 (Tenn. 2011).

First, Defendant argues that the evidence was insufficient to support his conviction for second degree murder. Second degree murder is defined as the "knowing killing of

another." T.C.A. § 39-13-210(a)(1). A person acts knowingly "when the person is aware that the conduct is reasonably certain to cause the result." T.C.A. § 39-13-101(a)(3). Whether a Defendant acts knowingly is a question of fact for the jury. *State v. Inlow*, 52 S.W.3d 101, 104-05 (Tenn. Crim. App. 2000). A jury may infer a defendant's mental state from "the character of the assault, the nature of the act and from all the circumstances of the case in evidence." *Id*. at 105.

In this case, the evidence viewed in a light most favorable to the State establishes that Defendant and the victim got into a physical altercation, and Ms. Adams testified that she heard a gunshot. The victim "limped round" to the back of her car and got in on the passenger side. He did not tell Ms. Adams that he had been shot, and he said, "[L]et's go." Defendant then went inside his grandmother's house to retrieve another gun. By Defendant's own admission, the victim was in the car with Ms. Adams with the door shut when Defendant walked up and shot the passenger-side window out of the vehicle where the victim was sitting. There was absolutely no testimony that the victim was attempting to threaten Defendant at that time. Defendant then walked around the front of Ms. Adams' car to the driver's side and told her to "move." Ms. Adams ducked, and Defendant shot the unarmed victim several more times. Although Defendant contends that he acted in self-defense, *see* T.C.A. § 39-11-611(b)(2)(A)-(C), the jury rejected this testimony, as was its prerogative. *State v. Ivy*, 868 S.W.2d 724, 727 (Tenn. Crim. App. 1991).

Next, Defendant argues that the evidence was insufficient to support his conviction for aggravated assault. As relevant here, aggravated assault is intentionally or knowingly causing another to reasonably fear imminent bodily injury by use or display of a deadly weapon. T.C.A. §§ 39-13-101; -102(a)(1)(A)(iii). A "deadly weapon" is defined as: "(A) A firearm or anything manifestly designed, made or adapted for the purpose of inflicting death or serious bodily injury; or (B) Anything that in the manner of its use or intended use is capable of causing death or serious bodily injury." T.C.A. § 39-11-106(a)(5).

Ms. Adams testified that Defendant pulled a black and silver gun from his pants and pointed it at her, and she was "terrified." Although Defendant testified that he never pointed the weapon at Ms. Adams, the jury chose to disbelieve his testimony and obviously accredited that of Ms. Adams.

Finally, Defendant contends that the evidence was insufficient to support his conviction for reckless endangerment against his two-month-old daughter, M.A. As pertinent to this case, reckless endangerment occurs when a defendant "recklessly engages in conduct that places or may place another person in imminent danger of death or serious bodily injury." T.C.A. § 39-13-103(a). A person acts recklessly "when the

person is aware of but consciously disregards a substantial and unjustifiable risk that the circumstances exist or the result will occur." T.C.A. § 39-11-302(c). Serious bodily injury includes bodily injury that involves a substantial risk of death, protracted unconsciousness, extreme physical pain, or protracted or obvious disfigurement. T.C.A. § 39-11-106(34).

The proof shows that Defendant shot into Ms. Adams' car while M.A. was strapped in her infant carrier in the backseat of the vehicle. Defendant knew that the child was in the vehicle because he had placed her there. As noted above, Defendant recklessly shot through the window of the car on the passenger side. Afterwards, he walked around to the driver's side of the car and fired multiple shots into the car risking death or serious bodily injury to M.A.

Based upon the evidence presented, a rational jury could find Defendant guilty of second degree murder, aggravated assault, and reckless endangerment. Defendant is not entitled to relief.

## II. Brady Violation

Defendant argues that the State violated *Brady v. Maryland* by failing to make the gunpowder residue kit known to defense counsel and to have it tested. However, the record reveals that the kit was made known to defense counsel who did not request that it be tested. Moreover, the evidence was not material.

In *Brady v. Maryland,* the United States Supreme Court held that "suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution." 373 U.S. 83, 87, 83 S. Ct. 1194, 10 L. Ed. 2d 215 (1963). "Evidence 'favorable to an accused' includes evidence deemed to be exculpatory in nature and *evidence that could be used to impeach the [S]tate's witnesses*." *Johnson v. State*, 38 S.W.3d 52, 55-56 (Tenn. 2001) (citations omitted) (emphasis added).

To prove a *Brady* violation, a defendant must demonstrate the following: (1) he requested the information (unless the evidence is obviously exculpatory, in which case the State is obligated to release such evidence regardless of whether or not it was requested); (2) the State suppressed the information; (3) the information was favorable to the defendant; and (4) the information was material. *State v. Edgin*, 902 S.W.2d 387, 390 (Tenn. 1995). Evidence is deemed material if "there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different." *United States v. Bagley*, 473 U.S. 667, 682, 105 S. Ct. 3375, 87 L. Ed. 2d 481 (1985). In determining whether a defendant had adequately proven the materiality of

8

favorable evidence suppressed by the State, "a reviewing court must determine whether the defendant has shown that 'the favorable evidence could reasonably be taken to put the whole case in such a different light as to undermine the confidence of the verdict.'" *Johnson*, 38 S.W.3d at 58 (quoting *Irick v. State*, 973 S.W.2d 643, 657 (Tenn. Crim. App. 1998). *Brady* does not require the prosecution "to disclose information that the accused already possesses or is able to obtain." *State v. Marshall*, 845 S.W.2d 228, 233 (Tenn. Crim. App. 1992).

On cross-examination, Dr. Curry testified that she collected a gunpowder residue kit from the victim and turned it over to police. She testified that kit would not show definitively whether the victim had fired a weapon. It would only show that he was in the presence of a gun that had been fired. Defendant filed a post-trial motion to have the gunpowder residue kit tested. At the hearing on Defendant's motion for new trial, the State pointed out that Dr. Curry's autopsy report indicated that she collected a gunpowder residue kit, and the autopsy report was provided to Defendant in discovery prior to trial. The State also noted that it invited defense counsel to look at all of the State's evidence during the week prior to trial. At no time did Defendant ask for the gunpowder residue kit or that it be sent to the TBI for testing.

The trial court found that Defendant had an opportunity to have the kit tested. The court did not believe that the gunpowder residue kit would have been exculpatory. It noted that even if it had been tested and showed that the victim fired a weapon, the proof revealed that Defendant killed the victim at a point when self-defense was no longer necessary.

The existence of the gunpowder residue kit in this case was not withheld from Defendant in violation of *Brady*, and Defendant did not request to have it tested. As pointed out by the State, *Brady's* duty does not extend to information possessed by a defendant or that he or she is able to obtain. *State v. Marshall*, 845 S.W.2d 228, 233 (Tenn. Crim. App. 1992). Moreover, Defendant has not shown that the evidence was material. Defendant admitted at trial that he was no longer threatened by the victim when he went inside the house, retrieved a gun, and walked back outside and shot the victim numerous times while the victim was seated in a car with the door shut and was presumably trying to leave the scene. As found by the trial court, even if the victim had fired a weapon earlier in the altercation, self-defense was no longer necessary when Defendant shot the victim. There was no testimony that the victim had a gun after he got into the car with Ms. Adams. Defendant is not entitled to relief on this issue.

_____
THOMAS T. WOODALL, PRESIDING JUDGE

9