IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT JACKSON
September 9, 2008 Session

**ERSKINE LEROY JOHNSON v. STATE OF TENNESSEE**

**Direct Appeal from the Criminal Court for Shelby County**
**No. P-29609    John P. Colton, Jr., Judge**

_____

**No. W2007-01546-CCA-R3-CO  - Filed September 30, 2009**

_____

The petitioner, Erskine Leroy Johnson, filed a petition for a writ of error coram nobis in the Shelby County Criminal Court, claiming that newly discovered evidence entitled him to a new trial.  After an evidentiary hearing, the coram nobis court dismissed the petition on the basis that the petitioner was at fault for timely failing to discover the evidence.  The petitioner appeals, maintaining that the newly discovered evidence entitles him to a new trial.  He also argues that the coram nobis court applied the incorrect standard in denying his petition for coram nobis relief, that the court did not address all of the evidence in denying his petition, and that a review of all the evidence shows he should receive a new trial.  The State argues that the coram nobis court should have dismissed the petition because it was untimely filed and that, in any event, the court properly denied the petition. Based upon our review, we conclude that due process required tolling the statute of limitations in this case and agree with the petitioner that the coram nobis court denied the petition based upon the incorrect standard.  Therefore, the court's denial of the petition is reversed, and the case is remanded to the coram nobis court for reconsideration of the petition.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court is Reversed, and the Case is Remanded.**

NORMA MCGEE OGLE, J., delivered the opinion of the court, in which ROBERT W. WEDEMEYER, J., joined.  JOHN EVERETT WILLIAMS, J., filed a dissenting opinion.

Gerald D. Skahan, Memphis, Tennessee, and Jonathan Blackman, David E. Brodsky, Carmine D. Boccuzzi, David H. Herrington, Elizabeth Vicens, and Boaz A. Weinstein, New York, New York, for the appellant, Erskine Leroy Johnson.

Robert E. Cooper, Jr., Attorney General and Reporter; J. Ross Dyer, Assistant Attorney General; William L. Gibbons, District Attorney General; and Dennis Johnson and Tom Hoover, Assistant District Attorneys General, for the appellee, State of Tennessee.

# OPINION

## I.  Factual Background

The record reflects that in 1985, a jury convicted the petitioner of first degree felony murder and sentenced him to death.  On direct appeal, our supreme court summarized the facts underlying the petitioner's conviction as follows:

> Between 8:30 and 9:00 a.m. on 2 October 1983 Joe Belenchia, owner of a Food Rite grocery in Memphis, was killed in the course of an attempted robbery.  An eyewitness to the holdup[, Tommy Perkins,] made an in-court identification of the defendant as the person who killed Mr. Belenchia.  He had also made a pretrial identification of defendant from a photo display.  He further identified, Jerome Moreland, a friend of defendant's, who was also involved.  The witness was not 100% sure of his identification at trial and only "pretty sure" of his pretrial identification. . . .  This witness had also seen a Burgundy-colored station wagon in the store parking lot with two people in the front and two in the back.  One of the passengers in the rear seat was a female.  This vehicle was subsequently linked to the crime.  Earlier in the morning of the robbery a young boy saw a man switching license plates from a car parked in the street to a maroon station wagon.  Three people were in the station wagon and the man switching the license plate was observed talking to a woman in a white car.  The number on the license plate was the same as the number on the vehicle used in the robbery.  A palm print taken from this vehicle was subsequently identified as defendant's.  Defendant was wearing an orange or rust colored suede or leather jacket which was identified by at least two witnesses to the robbery.  Another witness in the grocery store at the time of the robbery testified that a woman, accompanied by a man, attempted to get into the store office.  She was carrying a brown paper bag in her hand.  She was prevented from doing so by the security guard who in turn was restrained by the man, who put a gun to his head.  At that time the witness heard the sound of three shots coming from the front of the store.  During the police investigation the maroon station wagon was traced to the St. Louis Airport.  Defendant's cousin, Elizabeth Starks, testified that defendant and another man named Jerome came to her home the night before the homicide.  They were traveling in a maroon station wagon. The next morning defendant, Jerome and another man came to her residence.  Her boyfriend, Dennis Williams went with the three men to the store for cake mix about 7:00 a.m.  When Mr. Williams returned he was pale and acted exhausted and upset.  Subsequently

defendant, Jerome and a third man returned to her house. A woman in a white car also came there. As previously noted, the witness Beverly Batts testified that several months later defendant told her he and two friends had stolen a car from the St. Louis Airport and he had committed a robbery and murder in Memphis.

State v. Johnson, 762 S.W.2d 110, 115-16 (Tenn. 1988). The court affirmed the petitioner's conviction and death sentence. Id. at 120.

Subsequently, the petitioner filed a petition for post-conviction relief, claiming, in pertinent part, that the State withheld exculpatory evidence at trial. The post-conviction court denied relief, and the petitioner appealed to this court, claiming that the evidence "would have shown that another 'group' committed these offenses; this could have strengthened his alibi defense; and it could have been used to impeach Beverly Batts, who testified for the State that Defendant had confessed to the murder." Erskine Leroy Johnson v. State, No. 02C01-9707-CR-00292, 1999 Tenn. Crim. App. LEXIS 828, at *7 (Jackson, Aug. 12, 1999). This court agreed with the petitioner that the State withheld exculpatory evidence. Id. at *14. As this court explained, "The State possessed information regarding Michael Brown, Charles Keller, Eric Brown, and their possible connection to the shooting and to the getaway vehicle." Id. at **12-13. However, this court determined that the petitioner was not entitled to post-conviction relief, stating,

> The circumstantial proof linking Defendant to this shooting is strong. In addition to Mr. Perkins's identification of Defendant as the shooter, Defendant's palm print was found on the getaway car. Moreover, despite Defendant's claim that he was in St. Louis at the time of the shooting, his cousin, Elizabeth Starks, identified him as being in Memphis on the day of the shooting and identified him as being in the getaway car. She further testified that she and a friend had been in that car prior to the robbery. Her testimony was corroborated by the presence of their fingerprints in the car. Furthermore, Beverly Batts testified that Defendant confessed to a "cold-blooded" shooting in Memphis.
>
>         . . . .
>
> The identification by Perkins, the corroborated testimony of Starks, Defendant's admission to Batts and Defendant's palm print on the getaway car have not been overcome. . . . [T]he failure to reveal the Browns' and Keller's connection to the car [does not] undermine confidence in the verdict.

Id. at **15-17. Although this court affirmed the petitioner's conviction, it remanded the case for a

-3-

new capital sentencing hearing. Id. at *70. Our supreme court affirmed this court's ruling.[1] Johnson v. State, 38 S.W.3d 52, 63 (Tenn. 2001). On remand, the State did not seek the death penalty, and the trial court sentenced the petitioner to life.

On April 22, 2005, the petitioner filed a petition for writ of error coram nobis, claiming that he was entitled to a new trial based upon newly discovered evidence. Specifically, he argued that Dennis Williams recanted his testimony about the petitioner committing the robbery; that the petitioner recently learned during his investigation for his resentencing hearing that Elizabeth Starks was a very close friend of Betty Jo Ford, a member of the "Brown Gang," and, therefore, had a motive to testify against him in order to protect Ford; and that the State encouraged Tommy Perkins to identify him at trial as the shooter even if Perkins did not recognize him. The petitioner argued that "[r]eweighing the newly-discovered evidence of innocence along with the suppressed exculpatory evidence that was presented in the post-conviction hearing will overwhelmingly demonstrate the likelihood that the jury might have reached a different result if they had heard all of the facts."

The petitioner attached several affidavits to his petition. In the first affidavit, signed by Joe Roy Robinson, Robinson stated that he knew Elizabeth Starks and Betty Jo Ford from 1982 to 1983, that the two women "hung out together," and that he thought they "were some kind of kin to one another." In the second affidavit, signed by Dennis Williams, Williams stated that the petitioner was not one of the individuals who visited Starks' home on the weekend of October 1, 1983, and that he only identified the petitioner because he believed the police wanted his statement to "align" with Starks' statement. In the third affidavit, signed by Darvi Cunningham, Cunningham claimed that she met Ford through Starks in 1982 and that Starks and Ford were "very close." In the fourth affidavit, signed by Tommy Lee Perkins, Perkins stated that prior to identifying the petitioner at trial, one of the prosecutors told him the petitioner had changed his appearance. According to the affidavit, Perkins thought the prosecutor was "encouraging me to make an identification even if the [petitioner] looked different," and Perkins alleged in the affidavit that he "was not sure" the petitioner was the shooter when he identified the petitioner at trial.

At the hearing on the petition, Richard Walker testified for the petitioner that he knew Elizabeth Starks "from the neighborhood growing up as a little boy." Walker stated that he and Starks sang in separate gospel groups, that Starks' family sang in a group called the "Brown Singers," and that he would see her when their groups sang at churches or in music programs. When Walker was in high school, Starks introduced him to Betty Jo Ford. Walker described Starks' and Ford's relationship as "pretty tight" and "pretty much like partners." Walker and Ford began dating, and Ford became pregnant with Walker's child. After the baby was born, Walker lost contact with Ford. However, he occasionally would "run into" Starks, and Starks would tell him about Ford. He said he last ran into Starks about one and one-half years prior to the coram nobis hearing.

---

[1] The only issue the supreme court addressed on appeal was whether the petitioner was entitled to a new sentencing hearing.

On cross-examination, Walker acknowledged that he first met Ford in 1978 or 1979 and that he had not seen her in person since 1980. He also acknowledged that he had not seen Ford and Starks together since that time and did not know anything about their relationship.

Joe Roy Robinson testified that he was twenty-seven or twenty-eight years old in 1982 and "hung out" at the same nightclub, the Executive Lounge, as Elizabeth Starks and Betty Jo Ford. He stated that he saw Starks at the club about every weekend and that Starks and Ford usually came to the club together. He said that the women were "real close" and that he thought they were related. He also said that Starks and Ford worked as prostitutes for his brothers and that Starks, Ford, Darvi Cunnigham, and a woman named Andrea "started hanging out together." On cross-examination, Robinson testified that he saw Starks and Ford together for four or five years. He acknowledged that he did not know what kind of relationship they had but said they were "pretty close."

Melvin Hoyle testified that he was a truck driver and managed the Executive Lounge from 1977 to 1984. Elizabeth Starks came to the club on weekends, and she introduced him to Betty Jo Ford. Starks and Ford "seemed close," and Holye thought they were cousins. On cross-examination, Hoyle acknowledged that he never asked the women if they were related.

Regarding Dennis Williams' affidavit, the coram nobis court stated that it was not "reasonably satisfied" Williams' 1984 identification of the petitioner was false. Furthermore, the court stated that the "mere fact that Mr. Williams now claims, over twenty-three years later, that he was intimidated and coerced does not suffice to warrant a new trial." The court concluded that even assuming Williams' affidavit was true, the court was not reasonably satisfied that the jury "would have reached a different verdict had they been aware of it" because the State's case against the petitioner was strong.

Regarding Tommy Perkins' affidavit, the coram nobis court noted that Perkins testified at trial he was not one hundred percent sure about the shooter's identification. The court also noted that Perkins testified on cross-examination that he was told prior to identifying the petitioner that the suspect had been caught and that he was shown several photographs of the same person. Finally, the court noted that Perkins never claimed in his affidavit that his identification of the petitioner was false or coerced. Thus, the court concluded that the jury knew facts which could have called into question Perkins' identification, that the information contained in Perkins' affidavit "merely presents impeachment evidence which builds upon that which the Petitioner adduced at trial from his cross-examination of Perkins," and that the court was "not reasonably satisfied that the presentation of this additional evidence would have caused the jury to reach a different verdict."

As to Joe Roy Robinson's and Darvi Cunningham's affidavits, the coram nobis court stated that their information would have impeached the testimony of Elizabeth Starks, whom the court described as a "key witness for the State," because Starks' relationship with Ford would have given Starks a motive to lie for Ford. The court also concluded that Robinson's and Cunningham's information would have provided another link between the Brown gang and the Belenchia homicide "because if Starks were a member of the Brown gang, who were being investigated for the crime,

-5-

and she falsely implicated an unrelated party, then this would tend to implicate the Browns as trying to divert investigative attention from their group." However, the court concluded that the petitioner was at fault for not discovering the information earlier. The court asserted that the police reports contained information linking Starks to the Brown gang, and that the petitioner gained access to the "wrongly withheld" reports in 1989. The court concluded that although the evidence in the reports did not directly connect Starks with Ford, "the [indirect] connection was not sufficiently attenuated to justify a fifteen year delay in the presentation of this evidence because a cursory investigation of the individuals listed in the police reports could have easily led Petitioner to the testimony currently presented." The court further concluded that regarding all the evidence presented at the hearing, the petitioner failed to show that, "if presented, [it] would have resulted in a different verdict."

## II. Analysis

The petitioner contends that the coram nobis court erred by concluding he was not without fault for failing to discover the relationship between Starks and Ford earlier because even the Memphis police did not discover the connection between the women. Moreover, he argues that the court applied the incorrect standard in denying his petition for writ of error coram nobis, that the court disregarded the significance of the evidence presented by Dennis Williams and Tommy Perkins, that the court did not address all of the evidence in denying his petition, and that a review of all the evidence in this case shows he should receive a new trial. The State argues that the coram nobis court should have dismissed the petition because it was filed outside the one-year statute of limitations and that due process did not require tolling the statute of limitations because the petitioner could have and should have discovered the "new" information previously. The State also argues that, in any event, the coram nobis court properly denied the petition. We conclude that due process required tolling the statute of limitations in this case and agree with the petitioner that the coram nobis court denied the petition using the wrong standard.

Tennessee Code Annotated section 40-26-105(b) provides for relief by writ of error coram nobis as follows:

> The relief obtainable by this proceeding shall be confined to errors dehors the record and to matters that were not or could not have been litigated on the trial of the case, on a motion for a new trial, on appeal in the nature of a writ of error, on writ of error, or in a habeas corpus proceeding. Upon a showing by the defendant that the defendant was without fault in failing to present certain evidence at the proper time, a writ of error coram nobis will lie for subsequently or newly discovered evidence relating to matters which were litigated at the trial if the judge determines that such evidence may have resulted in a different judgment, had it been presented at the trial. The issue shall be tried by the court without the intervention of a jury, and if the decision be in favor of the petitioner, the judgment complained of shall be set aside and the defendant shall be granted a new trial in that

cause.

As our supreme court explained, in order to determine whether a petitioner is entitled to coram nobis relief,

> the trial judge must first consider the newly discovered evidence and be "reasonably well satisfied" with its veracity. If the defendant is "without fault" in the sense that the exercise of reasonable diligence would not have led to a timely discovery of the new information, the trial judge must then consider both the evidence at trial and that offered at the coram nobis proceeding in order to determine whether the new evidence <u>may have</u> led to a different result.

State v. Vasques, 221 S.W.3d 514, 527 (Tenn. 2007). It is well-established that the writ of error coram nobis "is an extraordinary procedural remedy . . . [that] fills only a slight gap into which few cases fall." State v. Mixon, 983 S.W.2d 661, 672 (Tenn. 1999). Generally, a decision whether to grant a writ of error coram nobis rests within the sound discretion of the trial court. State v. Hart, 911 S.W.2d 371, 375 (Tenn. Crim. App. 1995).

A petition for a writ of error coram nobis must be filed within one year of the judgment becoming final in the trial court. Tenn. Code Ann. § 27-7-103. "A judgment becomes final in the trial court thirty days after its entry if no post-trial motions are filed. If a post-trial motion is timely filed, the judgment becomes final upon entry of an order disposing of the post-trial motion." Mixon, 983 S.W.2d at 670. Thus, for determining when the statute of limitations begins to run for a writ of error coram nobis, the judgment often becomes final when the trial court denies a defendant's motion for new trial. See, e.g., id. As noted by our supreme court, "a timely petition for writ of error coram nobis will almost always be filed while [a direct] appeal is pending." Id. at 671.

Regarding the State's claim that the petition was time-barred, we note that the State properly preserved this issue by arguing at the coram nobis hearing that the coram nobis court should dismiss the petition because the petitioner filed it well-outside the one-year statute of limitations. See Harris v. State, 102 S.W.3d 587, 593 (Tenn. 2003) (stating that "the State bears the burden of raising the bar of the statute of limitations as an affirmative defense"). The coram nobis court did not address the State's argument, and the State maintains on appeal that the petition was untimely. The petitioner responds that the petition was timely filed on April 22, 2005, because the judgment of conviction did not become final until he was resentenced to life in prison on November 15, 2004.

Neither the State nor the petitioner has cited to any cases on point, and we have found none in Tennessee that specifically address this issue. That said, if we were to agree with the petitioner that the judgment did not become final until December 15, 2004, thirty days after the petitioner was resentenced, then it would suggest the judgment remained unfinalized in the trial court for approximately twenty years. Obviously, that is not the case. Furthermore, to conclude that the judgment did not become final until after resentencing would be "inconsistent with the longstanding

rule that persons seeking relief under the writ must exercise due diligence in presenting the claim" and "would unnecessarily compromise society's interest in finality" to criminal judgments. Id. at 670, 671.

In State v. Workman, 41 S.W.3d 100, 103 (Tenn. 2001), a capital case, our supreme court determined that due process may require tolling an applicable statute of limitations. In part, the Workman court relied on the due process considerations discussed in Burford v. State, 845 S.W.2d 204 (Tenn. 1992). In Burford, our supreme court recognized that "before a state may terminate a claim for failure to comply with procedural requirements such as statutes of limitations, due process requires that potential litigants be provided an opportunity for the presentation of claims at a meaningful time and in a meaningful manner" and that "under the circumstances of a particular case, application of the statute may not afford a reasonable opportunity to have the claimed issue heard and decided." 845 S.W.2d at 208. As the Workman court explained,

> to determine whether due process requires tolling in this case, we must consider the governmental interests involved and the private interests affected by the official action. In this case, as in Burford, the governmental interest in asserting the statute of limitations is the prevention of stale and groundless claims. The private interest involved here is the petitioner's opportunity to have a hearing on the grounds of newly discovered evidence which may have resulted in a different verdict if heard by the jury at trial.

The court concluded that Workman's interest in obtaining a hearing on his claims outweighed the governmental interest in the statute of limitations and, therefore, that due process precluded dismissing his claims based upon the statute of limitations. In Freshwater v. State, 160 S.W.3d 548 (Tenn. Crim. App. 2004), this court applied the doctrine set forth in Workman to non-capital cases.

Turning to the instant case, the petitioner is facing life in prison. This court has stated that a life sentence "is a sufficiently significant period of time to warrant a due process analysis despite the lapse of the statute of limitations." Ricky Jerome Harris v. State, No. E2005-00566-CCA-R3-PC, 2007 Tenn. Crim. App. LEXIS 901, at **18-19 (Knoxville, Dec. 3, 2007), perm. to appeal granted, (Tenn. 2008); see also State v. Ratliff, 71 S.W.3d 291, 297 (Tenn. Crim. App. 2001) (stating that "a sentence of twenty-four years, without eligibility for release, is a sufficiently significant period of time to warrant similar treatment for purposes of due process analysis"). The petitioner has raised serious questions as to whether he was present in Tennessee at the time of the Belenchia murder, and he alleges that he did not learn of Starks' and Ford's relationship until he interviewed Darvi Cunningham in June 2004 for his resentencing hearing. Although the coram nobis court concluded that information connecting Starks and Ford was in police reports that became available to the petitioner in 1989, the court also noted that the information was improperly withheld from the petitioner prior to trial. "[T]he State's finality interest is seriously compromised when the prosecution has suppressed evidence in violation of its constitutional duty and is directly responsible for causing the delay in finality." Harris v. State, 102 S.W.3d 587, 602

(Tenn. 2003) (Anderson, J. dissenting) (citing <u>Sample v. State</u>, 82 S.W.3d 267, 276 (Tenn. 2002)). Therefore, we conclude that due process required tolling the statute of limitations in this case.

Turning to the coram nobis court's denial of the petition, we note that the court's order only addressed the four affidavits attached to the petition. Although three witnesses testified at the hearing about Starks' and Ford's relationship, the court apparently did not consider their testimony. As this court has stated, if the affidavits attached to the petition are sufficient and justify an evidentiary hearing, the trial court should not determine the merits of the petition on the strength of the affidavits alone." <u>Id.</u> (citing <u>Hicks v. State</u>, 571 S.W.2d 849, 852 (Tenn. Crim. App. 1978)). Nevertheless, the analysis in the coram nobis court's order demonstrates to us that it was reasonably well satisfied with the veracity of the evidence regarding Starks' and Ford's friendship. Therefore, we will next consider whether the coram nobis court properly determined that the petitioner was not without fault in timely discovering the evidence.

The coram nobis court noted that although the State withheld the exculpatory police reports prior to trial, the petitioner gained access to the reports in 1989. Furthermore, as the court explained,

> the reports state that Miles McKinney provided a positive identification of the maroon station wagon as a vehicle that he had seen parked in front of Darvi Cunningham's home on two different occasions. . . . McKinney's statements led police to Andrea Jean Dennis who stated that Ms. Cunningham and Eric Brown were connected to certain vehicles which were stolen from the St. Louis airport. . . . Dennis also identified her boyfriend as Joe Roy Robinson, who had brothers named Deon, a.k.a. "Hard Times," and Cornelius. . . . She then went on to establish a connection between these individuals and Darvi Cunningham, Betty Jo Ford, and Michael Brown. . . . Petitioner produced Joe Robinson at the hearing for this petition and Mr. Robinson essentially testified to the exact facts which were contained within the aforementioned police reports. Thus, Petitioner has been privy to information since 1989 which, if investigated, could have provided them with the information which he produced at the March 2007 hearing. The proper time to have presented this information would have been at the post-conviction proceedings, which were held well after Petitioner had access to this material.

(Footnotes omitted.) The court also explained that additional police reports

> provided Petitioner with information establishing that Starks was potentially cousins with one of the female visitors to her house the night before the murder; that Shirley was one of those female visitors; that Starks and Shirley sang together in a gospel group and that Betty

-9-

Jo Ford had the tendency to use aliases.

The court concluded that "[a]lthough this evidence did not directly connect Starks and Ford, the connection was not sufficiently attenuated to justify a fifteen year delay in the presentation of the evidence." We agree that the evidence did not directly connect the two women. In fact, in our view, the evidence, at best, only suggested the two women knew each other. Additionally, nothing in the reports indicated the women were good friends. Therefore, we disagree with the coram nobis court's conclusion that the petitioner did not exercise due diligence in obtaining the new evidence.

The coram nobis court held that Starks' and Ford' relationship could have impeached Starks' testimony by providing Starks with a motive to "point the investigation towards another suspect." However, the court concluded that the petitioner failed to show the new evidence would have resulted in a different verdict. This was an incorrect standard to use in denying coram nobis relief. As Vasques clarified, the correct standard is whether the evidence may have, not would have, led to a different result. 221 S.W.3d at 527. We further note that "whether the testimony qualifies as impeachment evidence may be relevant in the determination but is not controlling. Impeachment evidence might be particularly compelling under the circumstances of a particular case." Vasques, 221 S.W.3d at 528. As the coram nobis court noted in its order, Elizabeth Starks was a very important witness for the State. Therefore, in light of the foregoing, we conclude that the case should be remanded to the coram nobis court for reconsideration of the petition based upon the correct standard.

### III. Conclusion

The coram nobis court's denial of the petition is reversed, and the case is remanded to the court for further proceedings consistent with this opinion.

_____
NORMA McGEE OGLE, JUDGE